185 P.3d 1197 (2008)
N. Jack ALHADEFF, Appellant,
v.
The MERIDIAN ON BAINBRIDGE ISLAND, LLC, a Washington limited liability company; James W. Andresen and Virginia R. Andresen, husband and wife and the marital community composed thereof; John M. Erickson and Jane Doe Erickson, husband and wife and the marital community composed thereof; T. Dennis Kirkpatrick and Suzanne C. Andresen, husband and wife and the marital community composed thereof; Bruce A. McCurdy and Connie M. McCurdy, husband and wife and the marital community composed thereof; and Kitsap Community Federal Credit Union d/b/a Kitsap Credit Union, a federally chartered credit union, Respondents.
No. 36340-2-II.
Court of Appeals of Washington, Division 2.
June 3, 2008.
Michael Daniel Ross, Ross Law Advisors PLLC, Bellevue, WA, John Joseph Mitchell, Attorney at Law, Bainbridge Island, WA, for Appellant.
Frank Raymond Siderius, Brian Conroy Read, Siderius Lonergan & Martin LLP, Seattle, WA, for Respondents.
ARMSTRONG, J.
¶ 1 N. Jack Alhadeff appeals a summary judgment order dismissing his claims against Kitsap Community Federal Credit Union in a case involving a letter of credit that Alhadeff authorized his bank to issue to the Credit Union. He argues that the trial court erred in finding that all his claims arise under Article 5 of the Uniform Commercial Code and that the Article's one-year statute of limitations thus bars his claims. We hold that Article 5's one-year statute of limitations applies only to claims for breach of the specific *1198 warranty contained in Article 5; it does not bar Alhadeff's claims for breach of contract, negligent misrepresentation and failure to inform, promissory estoppel, conversion, money had and received, and negligent certification that the construction project was not in default. Accordingly, we reverse and remand.

FACTS
¶ 2 In June 2003, the Credit Union made a construction loan to The Meridian on Bainbridge Island, LLC (Meridian). Meridian had already contributed over $2 million to the construction project, but it needed approximately $5.5 million to complete it. The Credit Union agreed to loan Meridian $4.5 million on condition that Meridian contribute an additional $1 million to the project by means of an irrevocable letter of credit. Meridian then persuaded Alhadeff to provide the letter of credit.
¶ 3 Under the letter of credit agreement between Alhadeff and Meridian, Alhadeff authorized his bank, Wells Fargo Bank, to provide the Credit Union with a letter of credit for Meridian's benefit. The letter of credit required the Credit Union to accompany a draft drawing on the letter of credit with a signed and dated statement containing the following:
The undersigned, an authorized officer of Kitsap Community Federal Credit Union, ("Kitsap") hereby certifies, under penalty of perjury, that all funds have been advanced (less any interest reserve) to The Meridian on Bainbridge Island, LLC (the "Borrower") under or in connection with that certain construction loan promissory note (the "Note") dated as of June 27, 2003 in the aggregate amount of $4,500,000 established by Kitsap in favor of the Borrower, an "Event of Default" (as defined in the Note) has not occurred, no event exists that may, with the passage of time, constitute an "Event of Default", Borrower is currently not in default, Kitsap has notified Mr. N. Jack Alhadeff of the intended drawing under the Wells Fargo Bank, N.A. Letter of Credit No. NZS488105, Kitsap will disburse the proceeds of this Letter of Credit to Borrower solely for the development and construction of the Project and such funds shall not be used by Kitsap for any other purpose, including, without limitation, retiring any portion of the Note, and Kitsap is now drawing the sum of {insert amount}.
Clerk's Papers (CP) at 41. Wells Fargo issued the letter of credit on July 2, 2003; it expired on June 24, 2004.
¶ 4 Before Wells Fargo issued the letter of credit, Alhadeff sent the Credit Union an email with a "proposed side letter agreement" attached. CP at 69-70. The document provided:
3. Kitsap Community Federal Credit Union shall not draw upon the Letter of Credit in the event [Meridian] is in default under the Construction Loan or an event exists that may, with the passage of time, constitute a default under the Construction Loan.
5. All amounts otherwise available for disbursement to [Meridian] shall be paid to [Alhadeff] until [Alhadeff is] paid in full. In addition, ten percent (10%) of the net proceeds from the sale of any portion of the Project shall be released to [Alhadeff] in payment of the amount owed by [Meridian] to [Alhadeff].
CP at 70.
¶ 5 The Credit Union responded with a letter that did not contain either of these paragraphs. In an accompanying e-mail, the Credit Union's director of commercial lending explained:
We have reviewed your proposed letter agreement and wish to make three changes:
. . . .
2. Paragraph # 5. We have eliminated this paragraph and suggest that the 10% net proceeds on the sale of units that was designated to Meridian be assigned by Meridian back to [Alhadeff]. This is much cleaner for us and we would honor that assignment. Using an assignment is a better method for us.
Paragraph # 3[.] On each request for draws under the Letter of Credit we are required to affirm that there are no events *1199 of default and think this is sufficient protection.
CP at 72.
¶ 6 The Credit Union drew on the letter of credit three times: on May 11, 2004 for $415,000; on June 11, 2004 for $474,850; and on July 8, 2004 for $110,150, thus drawing the full $1 million. A signed statement containing the required language and specifying the amount drawn accompanied each draft.
¶ 7 By the spring of 2004, Meridian had increased the scope of the construction project, adding at least $1 million to the construction costs. By May 11, 2004, the date the Credit Union first drew on the letter of credit, its officers knew about Meridian's expansion of the construction project and were concerned about Meridian's ability to pay for the costs. Yet they did not inform Alhadeff of the changes or their concerns. Meridian had also failed to pay its real estate taxes for the first half of 2004. In September 2004, after cost overruns had again increased, the Credit Union agreed to advance Meridian an additional $1.35 million.
¶ 8 In November 2006, the Credit Union declared the construction loan to be in default. Meridian also defaulted on its letter of credit agreement with Alhadeff. Because the Credit Union holds the first position deed of trust on the unsold condominium units and Meridian has no other assets, Alhadeff is not likely to recover from Meridian the approximately $1.6 million Meridian owes him under the letter of credit agreement.
¶ 9 Alhadeff filed this lawsuit in April 2007, and amended the complaint to assert claims against the Credit Union on August 30, 2007. He asserted breach of contract, tort, and equitable claims. The Credit Union moved for summary judgment, arguing that Alhadeff's claims all arose under the Uniform Commercial Code (U.C.C.)Letters of Credit, chapter 62A.5 RCW, and were barred by the one-year statute of limitations in RCW 62A.5-115. The trial court agreed and granted the Credit Union's motion.

ANALYSIS

I. Standard of Review
¶ 10 We review an order granting summary judgment de novo. Go2Net, Inc. v. FreeYellow.com, Inc., 158 Wash.2d 247, 252, 143 P.3d 590 (2006) (citing Troxell v. Rainier Pub. Sch. Dist. No. 307, 154 Wash.2d 345, 350, 111 P.3d 1173 (2005)). Summary judgment is appropriate where no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. CR 56(c). We take all facts, and reasonable inferences from those facts, in the light most favorable to the nonmoving party. Berrocal v. Fernandez, 155 Wash.2d 585, 590, 121 P.3d 82 (2005) (citing Wilson v. Steinbach, 98 Wash.2d 434, 437, 656 P.2d 1030 (1982)).
¶ 11 The Credit Union moved for summary judgment only on the basis of U.C.C. Article 5's statute of limitations. Thus, we do not address the merits of any of Alhadeff's claims; we consider only whether they are time-barred.

II. Letters of Credit
¶ 12 Parties often use letters of credit to "`facilitate the financing of commercial transactions . . . by providing a certain and reliable means to ensure payment for goods delivered or services rendered.'" Kenney v. Read, 100 Wash.App. 467, 471, 997 P.2d 455, 4 P.3d 862 (2000) (quoting Amwest Sur. Ins. Co. v. Republic Nat'l Bank, 977 F.2d 122, 125 (4th Cir.1992)). A letter of credit is essentially
a tripartite arrangement under which one party establishes a credit, usually at a bank, on which it authorizes a third party to draw, provided certain conditions are met. The bank, as a mere stakeholder of the credit, issues a letter to the third party (known as the beneficiary) confirming the credit and stating the conditions for any draw to be made against it. In essence, the bank's promise to pay the beneficiary upon the beneficiary's timely presentation to the bank of documents conforming to the conditions delimited in the letter replaces the promise of the party which established the credit.
Kenney, 100 Wash.App. at 471, 997 P.2d 455 (quoting Amwest, 977 F.2d at 125).
¶ 13 Washington has codified U.C.C. Article 5, governing letters of credit, in RCW 62A.5-101 through RCW 62A.5-118. Article 5 defines a letter of credit as "a definite undertaking . . . by an issuer to a beneficiary at *1200 the request or for the account of an applicant . . . to honor a documentary presentation by payment or delivery of an item of value." RCW 62A.5-102(j). A letter of credit transaction typically involves three parties with three distinct relationships. The "applicant" is the "person at whose request or for whose account a letter of credit is issued." RCW 62A.5-102(b). The "issuer" is the "bank or other person that issues a letter of credit." RCW 62A.5-102(i). And the "beneficiary" is the "person who under the terms of a letter of credit is entitled to have its complying presentation honored." RCW 62A.5-102(c). The underlying relationships are typically:
(1) the contract between the bank and its customer [the applicant] to issue a letter of credit; (2) the letter of credit in which the issuing bank agrees to pay the beneficiary when the conditions contained in the letter are complied with; and (3) the underlying contract between the customer and the beneficiary for which the letter of credit was obtained.
Kenney, 100 Wash.App. at 472, 997 P.2d 455 (quoting Ensco Envtl. Servs., Inc. v. United States, 650 F.Supp. 583, 588 (W.D.Mo.1986)).
¶ 14 Although atypical, a four-party letter of credit may be valid. For example, in Kenney, Read and Rook Broadcasting entered into an agreement for a one-year lease of Read's radio station pending sale of the station to Rook. Kenney, 100 Wash.App. at 469, 997 P.2d 455. Based on an agreement Rook entered into with Kenney, Kenney directed his bank to provide a letter of credit with Read as the beneficiary; Kenney did not directly communicate with Read. Kenney, 100 Wash.App. at 469-70, 997 P.2d 455. The first relationship was between Kenney, the applicant, and his bank, the issuer. Kenney, 100 Wash.App. at 472, 997 P.2d 455. The second relationship was the bank's obligation under the letter of credit to pay Read, the beneficiary. Kenney, 100 Wash.App. at 472, 997 P.2d 455. And the third relationship was the underlying lease agreement between Read, the beneficiary, and Rook (rather than between Read and Kenney, the applicant). Kenney, 100 Wash.App. at 472, 997 P.2d 455.
¶ 15 Similarly here, the first relationship was between Alhadeff, the applicant, and Wells Fargo, the issuer. The second relationship was Wells Fargo's obligation under the letter of credit to pay the Credit Union, the beneficiary.[1] And the third relationship was the underlying construction loan agreement between the Credit Union, the beneficiary, and Meridian (rather than between the Credit Union and Alhadeff, the applicant).[2]

III. Alhadeff's Claims
¶ 16 Alhadeff contends that the trial court erred in finding that his claims against the Credit Union arise under Article 5 and are therefore barred by Article 5's one-year statute of limitations.
¶ 17 The trial court found that the sole relationship between Alhadeff and the Credit Union was the letter of credit, that Alhadeff's sole line of recovery is under Article 5's warranty provision, and that Article 5's statute of limitations barred all of Alhadeff's claims.
¶ 18 Article 5's statute of limitations section provides:
An action to enforce a right or obligation arising under [Article 5] must be commenced within one year after the expiration date of the relevant letter of credit or one year after the cause of action accrues, whichever occurs later. A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.
RCW 62A.5-115. Alhadeff does not dispute that he brought his claims more than one year after his causes of action accrued. Rather, he maintains that Article 5 does not displace all legal and equitable principles associated with letters of credit transactions and that he may therefore maintain his causes of action in contract, tort, and equity.
*1201 ¶ 19 RCW 62A.5-103(1) defines the scope of Article 5: it "applies to letters of credit and to certain rights and obligations arising out of transactions involving letters of credit." The official comment to U.C.C. section 5-103 provides:
Like all of the provisions of the Uniform Commercial Code, Article 5 is supplemented by Section 1-103 and, through it, by many rules of statutory and common law. Because this article is quite short and has no rules on many issues that will affect liability with respect to a letter of credit transaction, law beyond Article 5 will often determine rights and liabilities in letter of credit transactions. Even within letter of credit law, the article is far from comprehensive; it deals only with "certain" rights of the parties.
U.C.C. § 5-103, cmt. 2.
¶ 20 Similarly, Washington's version of U.C.C. section 1-103 provides:
Unless displaced by the particular provisions of [the U.C.C.], the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.
RCW 62A.1-103. Washington courts have recognized that common law principles apply where U.C.C. provisions do not specifically displace them. See, e.g., S.S. Kresge Co. v. Port of Longview, 18 Wash.App. 805, 811, 573 P.2d 1336 (1977) (U.C.C. provisions "do not totally preempt the fields of law in which they speak"); Gorge Lumber Co. v. Brazier Lumber Co., 6 Wash.App. 327, 334, 493 P.2d 782 (1972) ("We view [RCW 62A.1-103] as a general adoption of common-law principles to commercial transactions, where the code provisions do not apply to replace them.").
¶ 21 Article 5, by its very terms, does not govern every aspect of letter of credit transactions but only "certain rights and obligations" relating to letters of credit. As the official U.C.C. comments note, Article 5 "has no rules on many issues that will affect liability with respect to a letter of credit transaction," and it contemplates that statutory and common law rules apply to and supplement its provisions. U.C.C. § 5-103, cmt. 2. Accordingly, Article 5's statute of limitations does not bar any of Alhadeff's claims that do not arise under the Article. The question then becomes whether his claims do in fact arise under Article 5.
¶ 22 Alhadeff brought eight claims against the Credit Union: (1) breach of contract for drawing on the letter of credit when Meridian was in default of the construction loan, (2) breach of contract for failing to pay Alhadeff 10 percent of the proceeds from the Credit Union's sale of condominium units after it foreclosed on the construction loan, (3) promissory estoppel based on the Credit Union's promise not to draw on the letter of credit if Meridian was in default, (4) negligence in certifying that Meridian was not in default, (5) negligent misrepresentation based on the Credit Union's statement that it would honor Meridian's assignment of 10 percent of the proceeds from the construction project, (6) conversion, (7) money had and received, and (8) negligence in failing to advise Alhadeff of changes in the scope of the construction project.
¶ 23 The Credit Union asserts that all of Alhadeff's claims arise under the warranty provision in RCW 62A.5-110. It maintains that Alhadeff is attempting to evade Article 5's statute of limitations by characterizing his claims as common law or equitable claims but that he has no basis for any cause of action outside of Article 5.
¶ 24 Article 5's warranty provides that, if the issuer honors the beneficiary's presentation, the beneficiary warrants to the applicant that "the drawing does not violate any agreement between the applicant and beneficiary or any other agreement intended by them to be augmented by the letter of credit." RCW 62A.5-110(1)(b). The official comments to U.C.C. section 5-110 explain:
In most cases the applicant will have a direct cause of action for breach of the underlying contract. This warranty has primary application in standby letters of credit or other circumstances where the applicant is not a party to an underlying contract with the beneficiary. It is not a warranty that the statements made on the presentation of the documents presented are truthful. . . . It is a warranty that the beneficiary has performed all the acts expressly *1202 and implicitly necessary under any underlying agreement to entitle the beneficiary to honor.
U.C.C. § 5-110, cmt. 2.
¶ 25 The comments provide two examples to illustrate the warranty's application. In the first example, a seller/beneficiary breaches an underlying sales contract by delivering defective goods. When the bank honors the beneficiary's draw on the letter of credit, the beneficiary has also breached its warranty to the applicant/buyer. U.C.C. § 5-110, cmt. 2. In this situation, the applicant has both a breach of warranty and a breach of contract claim against the beneficiary. In the second example, a beneficiary is authorized to draw on the letter of credit only upon the applicant's default under another agreement; the beneficiary breaches the warranty by drawing on the letter of credit when the applicant is not in default. U.C.C. § 5-110, cmt. 2. In this situation, the beneficiary has breached its warranty even in the absence of an underlying contract between the beneficiary and the applicant. In either case, the breach of warranty arises "not because the statements [in the documents presented to the issuer] are untrue but because the beneficiary's drawing violated its express or implied obligations in the underlying transaction." U.C.C. § 5-110, cmt. 2.
¶ 26 The comment directly states that an applicant has a "direct cause of action" for breach of an underlying contract. This understanding comports with the tripartite nature of letters of credit: the underlying contract is a separate and distinct relationship in the typical three-party letter of credit transaction. Kenney, 100 Wash.App. at 472, 997 P.2d 455. Moreover, in discussing Article 5's definition of "good faith," the U.C.C. comments state: "The contract between the applicant and beneficiary is not governed by Article 5, but by applicable contract law, such as Article 2 or the general law of contracts." U.C.C. § 5-102, cmt. 3. As Professors White and Summers have noted:
In most commercial letters of credit cases the warranty will not give the applicant more than it already has. In those cases the very same act that will be a breach of the warranty is likely also to be a breach of an underlying contract and so give the applicant a claim under Article 2 of the UCC or other law. Note, however, that the applicant's rights under Article 5 are unlikely to be coextensive with those under Article 2. For example, . . . Article 5 has a one-year statute of limitations, Article 2 has a four-year statute.
3 James J. White & Robert S. Summers, Uniform Commercial Code, § 26-9, at 164 (4th ed.1995). The same reasoning applies to an underlying contract governed by common law contract rules: a party to an underlying contract has a separate cause of action for breach of that contract, governed by general principles of contract law, including the longer statute of limitations.[3]
¶ 27 Indeed, a key concept with letters of credit is what White and Summers have termed the "independence principle." 3 White & Summers, supra, § 26-2, at 113. This principle states that the bank's obligation to pay the beneficiary is independent of the beneficiary's performance on the underlying contract.[4] 3 White & Summers, supra, § 26-2, at 113. Accordingly, most of Article 5's provisions deal with the relationship between the beneficiary and the issuer and a few deal with the relationship between the applicant and the issuer. 3 White & Summers, supra, § 26-2, at 120. But Article 5 does not "deal at all with the underlying contract between the applicant and the beneficiary." 3 White & Summers, supra, § 26-2, at 120. These comments demonstrate that Article 5's warranty provision does not encompass a claim on a contract underlying a letter of credit transaction.
*1203 ¶ 28 The Credit Union asserts that the warranty's reference to "any agreement" between the applicant and the beneficiary does not necessarily mean a contract separate from the letter of credit itself. But the letter of credit is a relationship between the issuer and the beneficiary (here, Wells Fargo and the Credit Union), not the beneficiary and the applicant. Kenney, 100 Wash.App. at 472, 997 P.2d 455. It strains the language of RCW 62A.5-110(b) to interpret "any agreement between the applicant and beneficiary" to include the letter of credit itself. See Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Order of Eagles, 148 Wash.2d 224, 239, 59 P.3d 655 (2002) (court will avoid interpretation of a statute that results in "unlikely, absurd, or strained consequences"). Moreover, the warranty also applies to "any other agreement intended by [the applicant and beneficiary] to be augmented by the letter of credit." RCW 62A.5-110(1)(b). To interpret this language to include the letter of credit as augmented by the letter of credit would be just as strained. Fraternal Order of Eagles, 148 Wash.2d at 239, 59 P.3d 655.
¶ 29 The trial court relied on Krause v. Stroh Brewery Co., 240 F.Supp.2d 632 (E.D.Mich.2002), to find that Alhadeff's sole line of recovery is Article 5's warranty. In Krause, Northland Beverage Corporation and Stroh Brewery Company entered into a contract brewing agreement. Krause, 240 F.Supp.2d at 634. To secure the agreement, Northland gave Stroh a letter of credit through Northland's bank; Stroh later collected on the letter of credit. Krause, 240 F.Supp.2d at 634. Northland's owners and shareholders, who secured the letter of credit with their personal assets, alleged that the collection was wrongful because the letter of credit agreement provided that Stroh agreed to not collect on the letter of credit unless Northland was in default. Krause, 240 F.Supp.2d at 634. The shareholders brought conversion, breach of contract, unjust enrichment, promissory estoppel, and negligence claims. Krause, 240 F.Supp.2d at 634.
¶ 30 The District Court for the Eastern District of Michigan concluded that Article 5's warranty "provides a cause of action for wrongfully collecting on a letter of credit." Krause, 240 F.Supp.2d at 635 (citing Mich. Comp. Laws § 440.5110(1)(b)). It held that the shareholders' breach of contract, unjust enrichment, and promissory estoppel claims arose under the letter of credit agreement and were barred by Article 5's one-year statute of limitations. Krause, 240 F.Supp.2d at 636. It then dismissed their conversion and negligence claims after finding that they arose out of the same agreement as the other claims. Krause, 240 F.Supp.2d at 636.
¶ 31 But the Krause court failed to recognize the separate nature of a contract underlying a letter of credit transaction. See Kenney, 100 Wash.App. at 472, 997 P.2d 455 (typical letter of credit transaction involves three separate and distinct transactions). As the comments to the U.C.C. make clear, Article 5 is supplemented by "many rules of statutory and common law." U.C.C. § 5-103 cmt. 2. And Washington's version of the U.C.C. states that "[u]nless displaced by the particular provisions of [the U.C.C.], the principles of law and equity . . . shall supplement its provisions." RCW 62A.1-103. Professors White and Summers explain that in most letters of credit cases, "the warranty will not give the applicant more than it already has. In those cases the very same act that will be a breach of the warranty is likely also to be a breach of an underlying contract." 3 White & Summers, supra, § 26-9, at 164. Thus, a party that bargains for additional protections in an underlying contract is entitled to the benefit of that protection. And general principles of contract law, including the statute of limitations on a contract action, govern claims for breach of an underlying contract. 3 White & Summers, supra, § 26-9, at 164. Because the Krause court's holding is contrary to the principles underlying Article 5, we do not follow it.
¶ 32 The Credit Union points out that the comments to U.C.C. § 5-110 state that the warranty "has primary application in standby letters of credit or other circumstances where the applicant is not a party to an underlying contract with the beneficiary."[5] U.C.C. § 5-110, cmt. 2. It argues that, *1204 because there was no contract between it and Alhadeff, the warranty applies to Alhadeff's claims and the statute of limitations thus bars them. Even if the warranty has "primary application" to situations where there is no contract between the applicant and the beneficiary, it does not necessarily control all claims between the parties who have no contract. Both the U.C.C. comments and Washington's adopted version plainly state that the Code is to be supplemented by legal and equitable principles. In any event, Alhadeff has alleged that there was a contract between him and the Credit Union. Article 5's statute of limitations does not prevent him from pursuing these separate claims.
¶ 33 Alhadeff claims that the exchange of letters between him and the Credit Union created a contract that the credit union breached by (1) drawing on the letter of credit even though Meridian was in default on the construction loan, and (2) refusing to pay him 10 percent of the proceeds from the construction project. Although these claims may rely on the same alleged conduct that would be subject to an Article 5 warranty claim, the claims are based on the alleged contract, not Article 5's warranty. If Alhadeff can prove an enforceable contract, he is entitled to its benefits. And these claims do not arise under Article 5. Rather, they supplement Alhadeff's Article 5 warranty rights and the one-year statute of limitations does not bar them.[6] The same analysis applies to Alhadeff's equitable and tort claims. Because none of them are based on the warranty, the warranty's statute of limitations does not bar them.
¶ 34 Reversed and remanded.
We concur: BRIDGEWATER, J., and VAN DEREN, A.C.J.
NOTES
[1] Although the letter of credit required the Credit Union to disburse the proceeds to Meridian, it identified the Credit Union as the beneficiary.
[2] Just as Kenney provided the letter of credit in consideration of Rook's promises and inducements, Kenney, 100 Wash.App. at 470, 997 P.2d 455, Alhadeff provided the letter of credit under an agreement between him and Meridian. This agreement is not part of the record.
[3] In Washington, the statute of limitations for actions on a written contract is six years, and for an oral contract is three years. RCW 4.16.040(1), .080(3).
[4] Accordingly, RCW 62A.5-103(4) provides that the rights and obligations of an issuer to a beneficiary are independent of the arrangements underlying a letter of credit. In other words, "the issuer must pay on a proper demand from the beneficiary even though the beneficiary may have breached the underlying contract with the applicant." 3 White & Summers, supra, § 26-2, at 113. For this reason, Wells Fargo was obligated to disburse funds to Kitsap Credit Union when the credit union presented a draft accompanied by a conforming statement. RCW 62A.5-108(1). Alhadeff makes no claims that Wells Fargo wrongfully honored Kitsap Credit Union's drafts.
[5] A standby letter of credit guarantees a contractual obligation; typically, the issuing bank agrees to pay the beneficiary if the applicant defaults on its obligation. Black's Law Dictionary 923 (8th ed.2004); see also Brenntag Int'l Chems., Inc. v. Bank of India, 175 F.3d 245, 251 (2nd Cir.1999) ("A stand-by letter of credit is meant to be drawn upon only in the event that its applicant fails to make a direct payment to the beneficiary. . . ."). At argument below, the Credit Union characterized the letter of credit as "sort of a stand-by arrangement," because the letter of credit required the Credit Union to disburse the entire $4.5 million construction loan to Meridian before the Credit Union drew on the letter of credit. RP at 4-5. Alhadeff asserts that the letter of credit cannot be a standby letter of credit because it was not used as security for any party's contractual performance. In any event, the characterization of the letter of credit does not affect the analysis here because Alhadeff has alleged that there was a contract between him and the Credit Union.
[6] The Credit Union argues that Alhadeff's breach of contract claims fail because there was no contract between them. But the Credit Union moved for summary judgment based on the statute of limitations only, and the trial court ruled only that the statute of limitations barred all of Alhadeff's claims. Whether the contract in fact existed is beyond the scope of the Credit Union's motion.