220 P.3d 1214 (2009)
167 Wash.2d 601
N. Jack ALHADEFF, Respondent,
v.
The MERIDIAN ON BAINBRIDGE ISLAND, LLC, a Washington limited liability company; James W. Andresen and Virginia R. Andresen, husband and wife and the marital community composed thereof; John M. Erickson and Jane Doe Erickson, husband and wife and the marital community composed thereof; T. Dennis Kirkpatrick and Suzanne C. Andresen, husband and wife and the marital community composed thereof; and Bruce A. McCurdy and Connie M. McCurdy, husband and wife and the marital community composed thereof, Defendants, and
Kitsap Community Federal Credit Union dba Kitsap Credit Union, a federally chartered credit union, Petitioner.
No. 81833-9.
Supreme Court of Washington, En Banc.
Argued September 24, 2009.
Decided November 25, 2009.
*1215 Frank Raymond Siderius, Brian Conroy Read, Siderius, Lonergan & Martin, LLP, Seattle, WA, for Petitioner.
Michael Daniel Ross, Ross Law Advisors PLLC, Bellevue, WA, John Joseph Mitchell, Attorney at Law, Bainbridge Island, WA, for Respondent.
J.M. JOHNSON, J.
¶ 1 Kitsap Credit Union (KCU) granted The Meridian on Bainbridge Island, LLC (Meridian) a loan to construct condominiums on Bainbridge Island. In order to satisfy a condition of the loan, Meridian persuaded N. Jack Alhadeff to authorize the issuance of a letter of credit (LOC) to KCU for the benefit of Meridian. The LOC required KCU to certify prior to drawing that the construction loan had been exhausted and that there were no events of default on the loan. Alhadeff and KCU exchanged a pair of letters confirming *1216 these certification requirements a few days prior to the issuance of the LOC. KCU drew on the LOC in May, June, and July 2004, making improper certifications each time and exhausting the LOC with the final draw.
¶ 2 Events of default occurred in April and May 2004 (a tax deficiency and a contractor's lien, respectively). KCU finally declared the entire loan to be in default in November 2006. In August 2006, Alhadeff brought suit against KCU, asserting breach of contract, tort, and equitable claims based on KCU's improper certifications when drawing on the LOC and failure to inform him of changed loan conditions.
¶ 3 The trial court granted summary judgment for KCU on the grounds that Alhadeff's claims arose under Article 5 of the Uniform Commercial Code (U.C.C.) (ch. 62A.5 RCW) and were time-barred by that provision's one-year statute of limitations. RCW 62A.5-110(1)(b), -115. The Court of Appeals reversed and remanded, holding that Alhadeff sought to enforce rights and obligations that did not arise under Article 5 and were thus not time-barred. We reverse the Court of Appeals, affirm the result and the greater part of the reasoning of the trial court, and remand for entry of summary judgment for KCU.

FACTS AND PROCEDURAL HISTORY
¶ 4 The factual background of the dispute in this appeal is significantly more complex than a typical LOC transaction because the case involves four parties, whereas most LOC transactions involve only three. See, e.g., 3 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 26-2 (5th ed.2008); 7A LARY LAWRENCE, LAWRENCE'S ANDERSON ON THE UNIFORM COMMERCIAL CODE §§ 5-102:5, -103:5 (3d rev. ed.2008).
¶ 5 The parties are (1) Meridian, which received a construction loan from (2) KCU. The loan required Meridian to obtain additional independent financing by means of an irrevocable LOC. Meridian arranged such an LOC from (3) Alhadeff in satisfaction of this requirement; Alhadeff authorized his bank, (4) Wells Fargo Bank, N.A. (Wells Fargo), to issue that LOC to KCU for the benefit of Meridian. Thus, in total, four parties are involved in this unusual LOC transaction: Meridian, KCU, Alhadeff, and Wells Fargo. The aspects of the transaction that are relevant to the present dispute are as follows.
¶ 6 On March 10, 2003, KCU committed to lend Meridian $4,500,000 to build a condominium project located on Bainbridge Island known as The Meridian on Bainbridge Island (the Project). Clerk's Papers (CP) at 5, 17. The commitment contained the following three conditions: First, it required that Meridian secure the loan with a first position deed of trust against the Project. CP at 17. Second, it required that the parties subordinate to the KCU deed of trust another deed of trust against the Project.[1] CP at 17, 24. Lastly and most importantly, it required that Meridian contribute additional equity to the Project by means of an irrevocable LOC in the amount of $1,000,000. CP at 24. These conditions were satisfied, and the construction loan transaction between Meridian and KCU was consummated on June 27, 2003. Id.
¶ 7 In satisfaction of the third condition, Meridian entered into a "Letter of Credit Agreement" with Alhadeff, who authorized his bank, Wells Fargo, to issue an irrevocable LOC to KCU for the benefit of Meridian.[2] CP at 6. Per his authorization, Wells Fargo issued an LOC in the amount of $1,000,000 to KCU on July 2, 2003. CP at 6, 17, 41-42. The terms of the LOC required KCU to make several certifications, one of which was that all funds under the $4,500,000 construction loan had been advanced to Meridian by KCU prior to KCU drawing on the LOC. CP at 41. It also required KCU to certify that no event of default as defined in the *1217 underlying construction loan had occurred and that there was no known risk that such an event would occur with the passage of time.[3]Id.
¶ 8 A few days before entering into the Letter of Credit Agreement, Alhadeff requested from KCU a letter setting forth the terms and conditions of the LOC. CP at 6, 18, 69. Alhadeff characterizes KCU's confirmation of the LOC terms and conditions as the "consideration" he was to receive from KCU in return for his agreement to fund the LOC.[4] CP at 6. KCU disputes this characterization of the confirmation. CP at 18.
¶ 9 Pursuant to his request, Alhadeff submitted to KCU a "proposed side letter agreement" on June 27, 2003, five days before the LOC was issued.[5] The letter contained, inter alia, the following two provisions:
3. Kitsap Community Federal Credit Union shall not draw upon the Letter of Credit in the event the borrower is in default under the Construction Loan or an event exists that may, with the passage of time, constitute a default....
....
5. [T]en percent (10%) of the net proceeds from the sale of any portion of the Project shall be released to you in payment of the amount owed by the Borrower to you.
CP at 70.
¶ 10 Five days later, KCU sent Alhadeff a revised letter and excluded those two proposed paragraphs. CP at 74. KCU explained the exclusion in an accompanying e-mail, citing redundancy with the terms of the LOC as the reason for excluding paragraph three and suggesting a more efficient method for the allocation of net proceeds as referenced in paragraph five.[6] Two of the three remaining paragraphs contain terms and conditions explicitly outlined in the LOC, neither of which the parties dispute. CP at 41, 74. The third paragraph relates to the manner in which KCU was to administer the disbursement *1218 to Meridian of the proceeds of its draws on the LOC and is not relevant to this appeal. CP at 74.
¶ 11 KCU drew on the LOC three times: on May 11, 2004, in the amount of $415,000; on June 11, 2004, in the amount of $474,850; and on July 8, 2004, in the amount of $110,150. CP at 36, 107-15. Together, these draws exhausted the entire $1,000,000 of the LOC. CP at 98. Each draft included the exact language of the certification required by the LOC. See supra note 3; CP at 36.
¶ 12 Despite KCU's assurances to the contrary in its certifications, events of default had occurred at the time that the drafts were submitted for honor. CP at 91, 95-97. The first of these events of default was a tax deficiency on the part of Meridian, which failed to pay its taxes on time for the first half of 2004.[7] CP at 117. The second was the imposition of a lien on the Project in favor of Rain City Contractors, Inc.[8] CP at 88. (Both obligations were later satisfied. CP at 91, 96-97.)
¶ 13 In addition to certifying that no events of default had occurred at the time of its draws on the LOC, KCU certified to Wells Fargo in conjunction with each draft that "no event exists that may, with the passage of time, constitute [an event of default]." CP at 41. However, KCU knew as early as April 2004 that Meridian had commenced work that was above budget. CP at 99. It further suspected at that time that Meridian would not be able to pay its construction costs going forward. CP at 100-01. This suspicion was confirmed when, after exhausting the construction loan and the LOC funds, Meridian applied to KCU in September 2004 for an additional loan of $1,350,000 to pay "unpaid invoices" and "additional costs" that Meridian had incurred in expanding the scope of the Project. CP at 118. In other words, prior to each of its draws, KCU had knowledge that events existed that may, with the passage of time, have constituted events of default. Id. KCU did not inform Alhadeff of these events, that is, of the additional loan application, the changes in the scope of the Project, or its uncertainty about Meridian's ability to pay construction costs. CP at 64.
¶ 14 KCU ultimately declared Meridian to be in default on the construction loan on November 29, 2006. CP at 77.
¶ 15 Alhadeff brought suit against KCU on August 30, 2006, alleging eight causes of action: (i) breach of contract for failure to make valid certifications upon drawing on the LOC, (ii) breach of contract for failure to pay Alhadeff 10 percent of the net proceeds from sales of the Project, (iii) negligent certification of the three draws, (iv) negligent misrepresentation in the confirmation letter, (v) negligence for failure to advise Alhadeff of changes in the financial circumstances and scope of the Project, (vi) conversion, (vii) promissory estoppel based on promises made by KCU in the confirmation letter, and (viii) money had and received. CP at 3, 8-12.
¶ 16 The trial court granted KCU's motion for summary judgment on the grounds that all of Alhadeff's claims arose under the statutory warranty of U.C.C. Article 5 and were time-barred by its one-year statute of limitations. CP at 145-48; RP at 30-32; RCW 62A.5-110(1)(b), -115. The court also ruled that his causes of action were unfounded in principles of tort, contract, and equity. RP at 32.
¶ 17 Alhadeff filed a timely notice of appeal. CP at 143-44. The Court of Appeals reversed, holding that his claims did not arise under Article 5 and thus were not barred by the statute of limitations. Alhadeff v. Meridian on Bainbridge Island, LLC, 144 Wash.App. 928, 944, 185 P.3d 1197 (2008). The Court of Appeals did not address the merits of the claims in its reversal of the trial court's judgment. See Alhadeff, *1219 144 Wash.App. at 928, 185 P.3d 1197. KCU petitioned this court for review, which was granted. Alhadeff v. Meridian on Bainbridge Island, LLC, 165 Wash.2d 1015, 199 P.3d 410 (2009).

STANDARD OF REVIEW
¶ 18 An order granting summary judgment is reviewed de novo. Go2net, Inc. v. Freeyellow.Com., Inc., 158 Wash.2d 247, 252, 143 P.3d 590 (2006) (citing Troxell v. Rainier Pub. Sch. Dist. No. 307, 154 Wash.2d 345, 350, 111 P.3d 1173 (2005)); Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 206, 11 P.3d 762, 27 P.3d 608 (2000). We view the facts and all reasonable inferences from those facts in the light most favorable to the nonmoving party. Berrocal v. Fernandez, 155 Wash.2d 585, 590, 121 P.3d 82 (2005) (citing Wilson v. Steinbach, 98 Wash.2d 434, 437, 656 P.2d 1030 (1982)). Summary judgment is proper only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Amalgamated Transit, 142 Wash.2d at 206, 11 P.3d 762; CR 56(c). The moving party has the burden of establishing the absence of an issue of material fact. SAS Am., Inc. v. Inada, 71 Wash.App. 261, 263, 857 P.2d 1047 (1993).

ANALYSIS
¶ 19 Letters of credit are frequently used "`to facilitate the financing of commercial transactions between buyers and sellers by providing a certain and reliable means to ensure payment for goods delivered or services rendered.'" Kenney v. Read, 100 Wash.App. 467, 471, 997 P.2d 455 (2000) (quoting Amwest Sur. Ins. Co. v. Republic Nat'l Bank, 977 F.2d 122, 125 (4th Cir.1992)). The model code governing letters of credit (U.C.C. Article 5) has been codified in RCW 62A.5-101 through RCW 62A.5-118. It defines an LOC as "a definite undertaking that satisfies the requirements of RCW 62A.5-104 by an issuer to a beneficiary at the request or for the account of an applicant ... to honor a documentary presentation by payment or delivery of an item of value." RCW 62A.5-102(1)(j).
¶ 20 LOC transactions usually involve three partiesthe applicant, the issuer, and the beneficiaryand give rise to three distinct relationships: the contract between the applicant and the issuer, usually the applicant's bank, to issue the LOC; the LOC, under which the issuer agrees to pay the beneficiary upon complying presentation; and the underlying contract between the applicant and the beneficiary that necessitates the LOC in the first place. U.C.C. § 5-102(a); Kenney, 100 Wash.App. at 471, 997 P.2d 455 (quoting Amwest, 977 F.2d at 125); see also 7A LARY LAWRENCE, LAWRENCE'S ANDERSON ON THE UNIFORM COMMERCIAL CODE § 5-102:5 (3d rev. ed.2008).
¶ 21 Four-party LOC transactions such as the one at issue in this appeal are uncommon but nevertheless valid. See Ensco Envtl. Servs., Inc. v. United States, 650 F.Supp. 583, 588-89 (W.D.Mo.1986); 7A LAWRENCE, supra, at § 5-103:5. One such transaction took place in Kenney, 100 Wash. App. at 467, 997 P.2d 455. In that case, the underlying contract that necessitated the LOC was not between the applicant and the beneficiary, as is customary in an LOC transaction, but rather was an agreement between the applicant and a fourth party. Likewise, the underlying contract that necessitated the LOC at issue in this appeal was not between the applicant, Alhadeff, and the beneficiary, KCU, but rather was the Letter of Credit Agreement between Alhadeff and a fourth party, Meridian. See App. A.
¶ 22 It should be noted, though, that the two cases are not identical, a fact lost on the Court of Appeals, which relied heavily on Kenney in holding that Alhadeff's claims were not time-barred. In Kenney, the applicant acted as a surety on the underlying loan, whereas here the applicant, Alhadeff, acted as a secondary lender in satisfaction of a condition of the underlying loan between KCU and Meridian. Kenney, 100 Wash.App. at 473-74, 997 P.2d 455. Also, the applicant in Kenney had no contact at all with the beneficiary, whereas here the applicant, Alhadeff, and the beneficiary, KCU, exchanged several e-mails and a letter confirming the conditions that KCU was required to satisfy before drawing on the LOC. Kenney is thus distinguishable.
¶ 23 Krause v. Stroh Brewery Co., 240 F.Supp.2d 632 (E.D.Mich.2002), a case that *1220 KCU claims to be "controlling," is also distinguishable. Br. of Resp't at 13. In Krause, as part of an action for wrongful collection on an LOC, the plaintiffs brought a series of common law claims for breach of contract, unjust enrichment, promissory estoppel, and negligenceclaims conspicuously similar to those raised by Alhadeff in this case rather than bringing claims under Article 5 of the U.C.C. 240 F.Supp.2d at 634. The court held that common law claims for wrongful collection on an LOC must be brought under Article 5; it consequently dismissed the plaintiffs' claims as barred by the Article 5 statute of limitations, which had expired. Id. at 636; U.C.C. § 5-115.
¶ 24 The decision of a federal district court in Michigan is emphatically not "controlling authority" in this jurisdiction. Furthermore, the facts of Krause meaningfully differ from those at issue in this appeal in that the underlying contract in Krause was a contract between the applicant and the beneficiary, whereas here the underlying contract is the Letter of Credit Agreement between Alhadeff, the applicant, and Meridian, a fourth party. Id. at 634. Thus, reliance on Krause, like reliance on Kenney, is inappropriate.
¶ 25 Regardless of whether there are three or four parties involved in an LOC transaction, Article 5 governs disputes involving "letters of credit and to certain rights and obligations arising out of transactions involving letters of credit." RCW 62A.5-103(1). Section 5-115 of Article 5 imposes a strict, one-year statute of limitations on most actions stemming from LOC transactions:
An action to enforce a right or obligation arising under this Article must be commenced within one year after the expiration date of the relevant letter of credit or one year after the cause of action accrues, whichever occurs later. A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.
RCW 62A.5-115.
¶ 26 The core of the present appeal boils down to a dispute about the meaning and scope of the phrase, "[a]n action to enforce a right or obligation arising under this Article." Id. Alhadeff contends that his causes of action, grounded as they are in the common law, do not seek to enforce rights or obligations "arising under" Article 5. KCU, on the other hand, argues that Alhadeff's claims do in fact seek to enforce rights or obligations "arising under" Article 5 and that they are thus barred by the one-year limitations period. The trial court sided with KCU, concluding that all of the causes of action arose under the Article 5 warranty and were barred by the statute of limitations. The Court of Appeals disagreed, characterizing his actions as arising under the common law of contract, tort, and equity, not the warranty, and therefore holding that they were timely. For reasons outlined below, we agree with the trial court with respect to most of Alhadeff's claims and hold that they are barred by the statute of limitations; additionally, we find that his other claims are meritless. We thus reverse the Court of Appeals and remand for entry of summary judgment for KCU.
¶ 27 The official comment to U.C.C. section 5-103 suggests that Article 5, although it "applies to letters of credit and to certain rights and obligations arising out of transactions involving letters of credit," RCW 62A.5-103(1), does not act as the exclusive authority over all LOC transactions. Rather, it is supplemented by statutory and common law:
Like all of the provisions of the Uniform Commercial Code, Article 5 is supplemented by Section 1-103 and, through it, by many rules of statutory and common law. Because this article is quite short and has no rules on many issues that will affect liability with respect to a letter of credit transaction, law beyond Article 5 will often determine rights and liabilities in letter of credit transactions. Even within letter of credit law, the article is far from comprehensive; it deals only with "certain" rights of the parties.
U.C.C. § 5-103 cmt. 2. Similarly, Washington's version of U.C.C. section 1-103 provides:
Unless displaced by the particular provisions of [the U.C.C.], the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, *1221 duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.
RCW 62A.1-103.
¶ 28 Alhadeff relies heavily on these authorities in arguing that the Article 5 limitations period does not bar his claims. He contends that no specific provisions of Article 5 displace his common law claims against KCU. As such, the claims do not "arise under" the article and are not barred. KCU, on the other hand, argues that Alhadeff's claims are entirely displaced by the Article 5 warranty and that, as a result, they "arise under" Article 5 and are barred by its one-year statute of limitations.
¶ 29 The warranty provision indicates that upon honor of a draw on an LOC, the beneficiary warrants to the applicant:
that the drawing does not violate any agreement between the applicant and beneficiary or any other agreement intended by them to be augmented by the letter of credit.
RCW 62A.5-110(1)(b). In other words, the beneficiary warrants that he has performed "all the acts expressly and implicitly necessary under any underlying agreement to entitle the beneficiary to honor." U.C.C. § 5-110 cmt. 2. The official comment to the U.C.C. suggests that this warranty "has primary application in standby letters of credit or other circumstances where the applicant is not a party to an underlying contract with the beneficiary." Id. If, on the other hand, the applicant is a party to an underlying contract with the beneficiary, "the applicant will [also] have a direct cause of action for breach of the underlying contract." Id. Thus, the Article 5 warranty creates an auxiliary cause of action to protect the applicant from wrongful drawings by the beneficiary in cases where the applicant lacks a common law contractual basis for his claims. The official comment states with specificity that the statute of limitations applies to this auxiliary cause of action. Id. § 5-115 cmt. 2 ("This section applies to ... claims for breach of warranty under Section 5-110.").
¶ 30 Whether the auxiliary cause of action displaces Alhadeff's common law claims, thereby rendering them claims that "arise under" Article 5 and are subject to its limitations period, accordingly depends on whether his claims are based on an underlying contract or promise between KCU and Alhadeff, or some independent duty owed by KCU to Alhadeff. If so, the warranty merely supplements his claims and the statute of limitations does not apply to them. If not, the warranty displaces his claims and the statute of limitations applies to and bars them.
¶ 31 The answer to this question is clear with respect to Alhadeff's two breach of contract claims. No underlying contract existed between Alhadeff, the applicant, and KCU, the beneficiary. Rather, the underlying contract in the transaction, the Letter of Credit Agreement, was between Alhadeff and a fourth party, Meridian. The letter between Alhadeff and KCU confirming the terms of the LOC is not a contract. Its language does not indicate an offer, acceptance, or any new consideration. The letter merely verified the conditions under which KCU was entitled to draw on the LOC. The trial court specifically held that there was no contract between Alhadeff and KCU recognized by the common law. RP at 32. With no underlying contract to breach, Alhadeff has no basis outside of the statutory warranty for his breach of contract claims. Accordingly, these claims are displaced by the warranty and barred by the one-year limitations period.
¶ 32 In holding the contrary, the Court of Appeals relied heavily on the independence principle, RCW 62A.5-103(4), which states that rights and obligations under an LOC are independent contracts or arrangements between the applicant and the beneficiary. The court further took note of the view that:
"In most commercial letters of credit cases the warranty will not give the applicant more than it already has. In those cases the very same act that will be a breach of the warranty is likely also to be a breach of an underlying contract and so give the applicant a claim under Article 2 of the UCC or other law."
Alhadeff, 144 Wash.App. at 940, 185 P.3d 1197 (quoting 3 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 26-8, at 164 (4th ed.1995)).
*1222 ¶ 33 However, the referenced passage is merely a suggested interpretation. By its own terms, its analysis applies only to "most" Article 5 cases, not all of them. In cases such as the one at issue in this appeal where there is no underlying contract between the applicant and the beneficiary, there can be no breach of contract to give the applicant a claim under Article 2 or the common law. Later in the same treatise, it is noted:
In many standby[] [LOC transactions] the applicant will not have a direct contractual claim against the beneficiary. That applicant would not have a contract claim even when the beneficiary's draw was not authorized by the underlying deal.
3 WHITE & SUMMERS, § 26-8, at 164.[9] The LOC at issue in this appeal is not a standby LOC, although Alhadeff initially characterized it as such. CP at 70. Nevertheless, it is analogous to a standby LOC in the sense that there is no contract between the applicant and the beneficiary on which to base a direct contractual claim. The applicant, Alhadeff, thus does not have an independent basis for his contract claims even though KCU's draws were not "authorized by the underlying deal." 3 WHITE & SUMMERS, § 26-8, at 164. Without a separate contractual claim, Alhadeff's breach of contract actions are wholly displaced by the Article 5 warranty and as a result are barred by the one-year statute of limitations.
¶ 34 Alhadeff's promissory estoppel claim similarly has no foundation outside of the Article 5 warranty. The promise that he alleges forms the basis of this claimthat KCU would not draw on the LOC if Meridian was in defaultwas made by KCU to Wells Fargo in KCU's certifications; it was not made to Alhadeff. Although the letter signed by KCU and Alhadeff verified the subject matter of the promise, it did not incorporate Alhadeff as a second promisee. His estoppel claim is thus displaced by the warranty and barred by the statute of limitations.
¶ 35 The negligence claims that Alhadeff makes against KCU also fall within the scope of the Article 5 warranty. In an action for negligence, a plaintiff must prove the existence of a duty, breach of that duty, resulting injury, and proximate causation. Curtis v. Lein, 150 Wash.App. 96, 102-03, 206 P.3d 1264 (2009). "The threshold determination of whether a duty exists is a question of law." Id. at 103, 206 P.3d 1264. A duty may be predicated on violation of either a statute or common law principles of negligence. Bernethy v. Walt Failor's, Inc., 97 Wash.2d 929, 932, 653 P.2d 280 (1982). Here, Alhadeff failed to demonstrate any duty owed to him by KCU other than those owed under the Article 5 warranty to make accurate representations in its certification to Wells Fargo. Nor did he demonstrate that KCU had a duty to inform him of changes in the financial circumstances and scope of the Project. Indeed, the trial court held that "no other duties [...] recognized by the common law" applied to the LOC transaction. RP at 32. Thus, the only duties owed to Alhadeff by KCU were those arising under the Article 5 warranty and his negligence claims are barred by the one-year statute of limitations.
¶ 36 Alhadeff failed to argue the merits of his claim for money had and received beyond naming it at trial and stating its relation to conversion. In order to recover under this doctrine, the plaintiff's claim must be based upon a recognized principle of equity. Coast Trading Co., Inc. v. Parmac, Inc., 21 Wash.App. 896, 902-03, 587 P.2d 1071 (1978). Alhadeff has identified no such principle upon which his claim for money had and received is based. Even viewing the evidence in the light most favorable to Alhadeff, there is no genuine issue of material fact as to the merits of this claim and KCU is *1223 entitled to judgment as a matter of law. For this reason, and not the reason cited by the trial court, we affirm that court's dismissal of Alhadeff's claim for money had and received.
¶ 37 Alhadeff's conversion claim merits the same treatment. Conversion is rooted in the common law action of trover and occurs when a person intentionally interferes with chattel belonging to another, either by taking or unlawfully retaining it, thereby depriving the rightful owner of possession. Davenport v. Wash. Educ. Ass'n, 147 Wash.App. 704, 721-22, 197 P.3d 686 (2008); Lang v. Hougan, 136 Wash.App. 708, 718, 150 P.3d 622 (2007). Money may be the subject of conversion if the defendant wrongfully received it. Davenport, 147 Wash.App. at 722, 197 P.3d 686; Westview Invs., Ltd. v. U.S. Bank Nat'l Ass'n, 133 Wash.App. 835, 852, 138 P.3d 638 (2006). KCU did not do so when it drew on the LOC: KCU did not "take" the funds in the sense of conversion, given that Alhadeff authorized Wells Fargo to issue the funds to KCU, nor did it unlawfully retain them, since KCU used the funds for the Project as agreed. The conversion claim consequently does not raise a genuine issue of material fact as to whether KCU intentionally interfered with the money drawn on the LOC, and we thus affirm, albeit on different grounds, the trial court's decision to dismiss.

CONCLUSION
¶ 38 We conclude that none of Alhadeff's eight causes of action survive KCU's motion for summary judgment. We reverse the Court of Appeals and affirm the judgment of the trial court dismissing Alhadeff's claims for breach of contract, promissory estoppel, and negligence as time-barred by the Article 5 statute of limitations. We also hold that the claims for money had and received and conversion did not present an issue sufficient to survive summary judgment. Accordingly, we remand the case for entry of summary judgment for KCU on all claims.
WE CONCUR: GERRY L. ALEXANDER, C.J., CHARLES W. JOHNSON, BARBARA A. MADSEN, RICHARD B. SANDERS, TOM CHAMBERS, SUSAN OWENS, MARY E. FAIRHURST and DEBRA L. STEPHENS, JJ.

APPENDIX A

NOTES
[1] The deed of trust belonged to Michael Mastro, who is not a party in the present case. Following subordination, it became the second position deed of trust against the Project.
[2] The terms of the Letter of Credit Agreement are not at issue in this appeal. The only relevant term, which is referenced in the confirmation letter, see infra, is the assignment by Meridian of 10 percent of the proceeds of the ultimate sale of the Project to Alhadeff. Report of Proceedings (RP) at 28.
[3] The full text of the required certification read: "The undersigned, an authorized officer of Kitsap Community Federal Credit Union, ('Kitsap') hereby certifies, under penalty of perjury, that all funds have been advanced (less any interest reserve) to The Meridian on Bainbridge Island, LLC (the `Borrower') under or in connection with that certain construction loan promissory note (the `Note') dated as of June 27, 2003 in the aggregate amount of $4,500,000 established by Kitsap in favor of the Borrower, an `Event of Default' (as defined in the Note) has not occurred, no event exists that may, with the passage of time, constitute an `Event of Default', Borrower is currently not in default, Kitsap has notified Mr. N. Jack Alhadeff of the intended drawing under the Wells Fargo Bank, N.A. Letter of Credit No. NZS488105, Kitsap will disburse the proceeds of this Letter of Credit to Borrower solely for the development and construction of the Project and such funds shall not be used by Kitsap for any other purpose, including, without limitation, retiring any portion of the Note, and Kitsap is now drawing the sum of {insert amount}." CP at 41.
[4] In an e-mail accompanying the letter, Alhadeff's attorney described the conditions as "the understanding [Alhadeff] is relying upon is [sic] having Wells Fargo issue the Letter of Credit." CP at 69.
[5] Alhadeff's attorney labeled the communication a "side letter agreement." CP at 69. In its reply, KCU used similar language. CP at 72. This terminology merits clarification. By its terms, the letter sets forth KCU's "agreement regarding the Letter of Credit." CP at 74. The term "agreement" is ambiguous in this context in the sense that it could refer to either the existing agreement between KCU and Wells Fargo regarding the conditions under which KCU could draw on the LOC or a separate agreement between Alhadeff and KCU represented by the letter. The letter does not, however, contain any consideration to support a separate agreement between Alhadeff and KCU. The issuance of the LOC cannot act as consideration received by KCU for such an agreement since both versions of the letter state that "Wells Fargo Bank has issued the above referenced Letter of Credit," which implies that the issuance of the LOC by Wells Fargo predates the letter. CP at 74. The term "agreement" thus most plausibly refers to the existing agreement between KCU and Wells Fargo, not a separate agreement between KCU and Alhadeff. To avoid confusion on this point, we refer to the "side letter agreement" as the "confirmation letter" or "letter" throughout.
[6] The relevant passages read: "Paragraph # 5. We have eliminated this paragraph and suggest that the 10% net proceeds on the sale of units that was designated to Meridian be assigned by Meridian back to Jack. This is much cleaner for us and we would honor that assignment. Using an assignment is a better method for us.... Paragraph #3. On each request for draws under the Letter of Credit we are required to affirm that there are no events of default and think this is sufficient protection." CP at 72.
[7] The tax deficiency occurred on May 1, 2004, and was not cured prior to the draws made on May 11, June 11, or July 8 of that year. CP at 95-97. This rendered all three of the certifications improper for want of disclosure of the deficiency as an event of default.
[8] KCU admitted that it knew of this lien as early as June 4, 2004, and the lien was not released until June 29, 2004. CP at 90, 92-93. Thus, the June 11, 2004, certification, but not the July 8, 2004, certification, was improper for want of disclosure of the lien as an event of default. CP at 91. The May 11, 2004, certification was likely not improper for want of disclosure of the lien, since KCU did not know of the lien on that date. Id.
[9] A standby LOC is a letter of credit that collateralizes a loan from the beneficiary to a debtor. See Citizens State Bank of Lometa v. FDIC, 946 F.2d 408, 414 (5th Cir.1991). According to the terms of the letter, the applicant agrees to secure the debt that the debtor owes the beneficiary such that the beneficiary may draw on the letter to recover the value of the loan if the debtor defaults. See id. Thus, the LOC acts as a guaranty agreement, with the applicant guaranteeing the debt. See id.; see also BROOKE WUNNICKE ET AL., STANDBY AND COMMERCIAL LETTERS OF CREDIT § 2.4, at 16 (2d ed. 1996). Note that in these types of LOC transactions the underlying contract is the loan agreement between the debtor and the beneficiary; there is no underlying contract between the applicant and the beneficiary.