[No. 77663-6.   En Banc.]
Argued May 25, 2006.     Decided September 28, 2006.

Go2Net, Inc., *Respondent,* v. FreeYellow.com, Inc., *Defendant,* John Molino, *Petitioner.*

*Mark S. Clark* and *Mary E. Crego* (of *Hills Clark Martin & Peterson, P.S.*), for petitioner.

*Peter A. Danelo* and *Felix G. Luna* (of *Heller Ehrman, L.L.P.*), for respondent.

*Robert M. McKenna, Attorney General, Carol A. Murphy, Senior Counsel,* and *Susan L. Carlson, Assistant,* on behalf of the Department of Financial Institutions, amicus curiae.

¶1 Owens, J. — Stock seller John Molino seeks review of a partially published Court of Appeals decision affirming

the trial court's rescission of a merger agreement between Molino's company, FreeYellow.com, Inc. (FreeYellow), and Go2Net, Inc., an Internet service company. Molino does not challenge the jury's findings that Go2Net, in entering the agreement, relied on Molino's material misrepresentation or omission regarding the ownership of his company— findings that established Molino's violation of The Securities Act of Washington (Act), chapter 21.20 RCW. Molino challenges the trial court's determination on summary judgment that the equitable defenses of waiver and estoppel are barred under the Act.

¶2 We hold that such defenses are unavailable in claims brought under RCW 21.20.010(2). We therefore affirm the Court of Appeals.

## FACTS

¶3 On October 22, 1999, Go2Net purchased Molino's FreeYellow for $1 million in cash and $18.5 million in unregistered Go2Net stock. Shortly after Go2Net announced the acquisition to the press, Go2Net received a phone call from an Arizona attorney representing Patricia Warren, who claimed to have a 50 percent interest in the company Go2Net had just purchased. In the phone call and in a follow-up letter on November 9, 1999, Warren's attorney explained that Warren and Molino had jointly owned an Arizona Internet company formed in 1997, the Free Yellow Pages Corporation, and that, in response to problems in that business relationship, Molino had moved the company's assets to Florida, transferring them to his newly incorporated company, FreeYellow, without compensating Warren.[1]

¶4 In response to the letter from Warren's attorney, Go2Net contacted Molino and sought full disclosure regard-

---

[1] Molino settled Warren's initial suit but failed to make the first payment under the settlement agreement, prompting Warren's second suit against Molino. Warren's "claims were finally settled on August 8, 2002, well after witnesses had already begun testifying at trial in [the present case]." Br. of Resp't at 18 n.6 (citing Report of Proceedings (RP) (Aug. 21, 2002) at 82; Ex. 245).

ing Warren's claims. Reserving its right to seek rescission of the merger agreement, Go2Net offered to register the shares transferred to Molino if he "would agree to place the proceeds of any sale in an escrow account" until the Warren claim was satisfactorily resolved. Clerk's Papers (CP) at 85. In early October 2000, Molino's attorney notified Go2Net that he "was unwilling to enter into an escrow agreement." *Id.* Go2Net filed suit on October 19, 2000, asserting claims for fraudulent inducement, breach of contract, and breach of the implied covenant of good faith and fair dealing. In an amended complaint filed August 6, 2001, Go2Net added a fourth cause of action for violation of the Act. Among the affirmative defenses that Molino raised in his answer were waiver and estoppel. Molino counterclaimed on theories of breach of contract, unjust enrichment, and conversion.

¶5 In March 2002, the trial court granted Go2Net's summary judgment motion dismissing Molino's equitable defenses of waiver and estoppel. The trial court dismissed Molino's unjust enrichment and conversion claims in June 2002. The case was tried to a jury in August 2002. At the close of Go2Net's case, the court dismissed Go2Net's fraudulent inducement claim. In response to special interrogatories, the jury found that, with regard to Go2Net's acquisition of FreeYellow, Molino made an "untrue statement of fact" or "omit[ted] to state a fact necessary in order to make the statements made, in the light of circumstances in which they were made, not misleading."[2] The jury further found that the misrepresentation or omission was material and that Go2Net had relied on the misrepresentation or omission in its decision to acquire FreeYellow.

¶6 As the trial court's judgment acknowledged, the jury's findings on the verdict form established Molino's violation of the Act and mandated the trial court's imposition of the remedies set forth in RCW 21.20.430. Go2Net and Molino

---

[2] CP at 1792; *see* RCW 21.20.010(2). Molino "represented that the assets of FreeYellow.com were 'free and clear of any claims . . . or encumbrances of any kind whatsoever.' " Resp't's Answer to Amicus Br. of Dep't of Fin. Insts. at 6 n.3 (quoting Ex. 43, at § 3.10(a)).

were directed to return the stock they had exchanged in the merger. The trial court awarded Go2Net a judgment in the amount of $2,192,004.45, a total including the $1 million that Go2Net had given Molino, prejudgment interest on that amount, and Go2Net's reasonable costs and attorney fees. Pursuant to RCW 21.20.430, that judgment was then offset by $972,055.33, the amount of income that Go2Net and its parent company, InfoSpace, Inc., had realized from their operation of FreeYellow.[3] Go2Net's net judgment was thus approximately $1.2 million.[4]

¶7 Molino appealed, and Division One of the Court of Appeals affirmed. *Go2Net, Inc. v. FreeYellow.com, Inc.*, 126 Wn. App. 769, 109 P.3d 875 (2005). We granted Molino's petition for review at 156 Wn.2d 1024 (2006).

## ISSUE

¶8 In an action claiming that a seller violated the Act by misrepresenting or omitting material facts prior to sale, may the seller assert the equitable defenses of waiver and estoppel?

## ANALYSIS

▪ ¶9 *Standard of Review*. An appellate court reviews a trial court's decision on summary judgment de novo. *Troxell v. Rainier Pub. Sch. Dist. No. 307*, 154 Wn.2d 345, 350, 111 P.3d 1173 (2005). CR 56(c) provides that summary

---

[3] Pointing out that "Molino only earned $14,000 in the year in which he operated [FreeYellow]," Go2Net emphasized that "Molino benefited substantially from Go2Net's stewardship of the business," since FreeYellow earned more than $970,000 over the three-year period between acquisition and rescission. Suppl. Br. of Resp't at 6.

[4] Even though Molino's Go2Net shares had remained unregistered, Molino was able to "use them as the basis for a stock swap or 'collar' transaction that netted him $2.2 million. . . . Go2Net never requested, and the trial court never ordered Molino to return, any of that money." Answer to Pet. for Review at 7 n.5 (citing RP (Aug. 21, 2002) at 122; Ex. 181). Go2Net notes that "Molino has retained $1 million in cash he received from Go2Net at closing and $2.2 million in cash from the stock collar transaction," whereas, in contrast, Go2Net has been unable to collect anything on its $1.2 million judgment. Suppl. Br. of Resp't at 7.

judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Here, Molino has not challenged the jury's factual findings but has raised the purely legal question of the availability of equitable defenses under the Act. As with all legal questions, review of this issue is de novo. *Troxell*, 154 Wn.2d at 350.

¶10 *Availability of Equitable Defenses under the Act.* The "primary purpose" of the Act is *"to protect investors from speculative or fraudulent schemes of promoters."* *Cellular Eng'g, Ltd. v. O'Neill*, 118 Wn.2d 16, 23, 820 P.2d 941 (1991) (emphasis added). The Act "is remedial in nature and has as its purpose *broad protection of the public."* *McClellan v. Sundholm*, 89 Wn.2d 527, 533, 574 P.2d 371 (1978) (emphasis added). When interpreting this "remedial legislation," the court is "guided by the principle that 'remedial statutes are liberally construed to suppress the evil and advance the remedy.' " *Kittilson v. Ford*, 23 Wn. App. 402, 407, 595 P.2d 944 (1979) (quoting 3 C. DALLAS SANDS, STATUTES AND STATUTORY CONSTRUCTION § 60.01 (4th ed. 1973)), *aff'd*, 93 Wn.2d 223, 608 P.2d 264 (1980). Describing one of "the evils" to be suppressed, the antifraud provision makes it "unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly . . . [t]o *make any untrue statement of a material fact* or to *omit to state a material fact* necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." RCW 21.20.010(2) (emphasis added). The Act thus requires only proof of the seller's material, preclosing misrepresentation or omission; it does not require proof of the seller's intent to defraud, *Kittilson*, 93 Wn.2d at 225, nor does it require a showing that the misrepresentation or omission actually caused a purchaser to incur losses in a securities transaction. *Hines v. Data Line Sys., Inc.*, 114 Wn.2d 127, 135, 787 P.2d 8 (1990). Simply put, a seller's "violation [of the Act] is in the misrepresentation itself." *Id.* For a purchaser who still owns the security, the remedy for "the evil" of a seller's

material misrepresentation or omission is rescission of the transaction. The Act permits such a purchaser to file suit "to recover the consideration paid for the security, together with interest at eight percent per annum from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security." RCW 21.20.430(1); *see* RCW 21-.20.430(2) (permitting damages only if the security has been sold).

¶11 We reject Molino's contention that waiver and estoppel should be available defenses to a claimed violation of the Act. First, permitting a seller to assert equitable defenses is contrary to the Act's primary purpose of protecting investors. Because the Act is intended to deter a seller's presale misrepresentations and omissions, a seller should not be permitted to avoid statutory liability by shifting the focus to the postsale conduct of the uninformed investor. Second, because the Act sets forth a limited number of defenses to claimed violations of the Act, the Act's silence with respect to the equitable defenses of waiver and estoppel suggests that the legislature intended to exclude them. *See* RCW 21.20.430(3) (providing reasonable care defense for persons with control authority in liable entities); RCW 21.20.430(4)(b) (imposing three-year statute of limitations for civil actions); RCW 21.20.430(4)(b) (eliminating liability for person making written rescission offer); RCW 21.20.490 (providing defense for persons acting in good faith in conformity with rule, form, or order). Third, as the Court of Appeals noted in the present case, the legislature's "intention to hold violators strictly accountable" is apparent in RCW 21.20.430(5), which voids any contract provision requiring a purchaser "to waive compliance with [the Act]." 126 Wn. App. at 782. In other words, the Act prohibits a purchaser, such as Go2Net, from contractually agreeing to waive the protections of the Act's remedy provision, RCW 21.20.430(1). This strong antiwaiver provision is inconsistent with Molino's notion that Go2Net's postsale conduct could be interpreted under the Act as an implicit waiver of its entitlement to the Act's remedies.

¶12 Just as the purpose and structure of the Act weigh against Molino's argument, cases from other jurisdictions provide no persuasive support for his view that equitable defenses are available under the Act. Go2Net correctly asserts that "no Blue Sky decisions [i.e., no state court decisions] allow a seller who violates the act by making material misrepresentations to avoid liability through waiver and estoppel."[5] Molino relies on two state court cases that permitted the assertion of equitable defenses, but in both cases, the seller's violation was a failure to register the securities, not a presale misrepresentation of material facts about the security. *See Midwest Mgmt. Corp. v. Stephens*, 291 N.W.2d 896 (Iowa 1980); *Logan v. Panuska*, 293 N.W.2d 359 (Minn. 1980). In *Midwest*, the defendants solicited Midwest's participation in a securities broker-dealer venture. They offered to purchase specific amounts of Midwest stock in exchange for start-up capital for the new business. When the business failed, Midwest sued to enforce the subscription agreements, but the purchasers successfully argued on summary judgment that under Iowa's Blue Sky Law, they were entitled to rescind the agreement since Midwest had failed to register the securities. The Iowa Supreme Court reversed the summary dismissal of Midwest's suit and held that the estoppel defense was available to stock seller Midwest, despite its violation of the registration requirements. 291 N.W.2d at 908. Similarly, in *Logan*, purchasers of stock in a troubled restaurant that later completely failed sought to rescind the transactions based on the seller's failure to comply with the registration requirement of Minnesota's Blue Sky Law. The Minnesota Supreme Court held that the restaurant seller could assert an estoppel defense since the purchasers "were not induced to buy the stock through any misrepresentation of the defendant as to the financial condition of the restaurant

---

[5] Suppl. Br. of Resp't at 11. "The name that is given to the law indicates the evil at which it is aimed, that is, to use the language of a cited case, 'speculative schemes which have no more basis than so many feet of "blue sky" '; or, as stated by counsel in another case, 'to stop the sale of stock in fly-by-night concerns, visionary oil wells, distant gold mines and other like fraudulent exploitations.' " *Hall v. Geiger-Jones Co.*, 242 U.S. 539, 550, 37 S. Ct. 217, 61 L. Ed. 480 (1917).

[and had] actively participated in the management and control of the corporation during the course of their investment." 293 N.W.2d at 363-64.

¶13 In sum, *Midwest* and *Logan* would be analogous to the present case only if Go2Net's basis for rescinding its purchase of FreeYellow had been the Act's registration requirement, RCW 21.20.140, rather than its antifraud provision, RCW 21.20.010. And, even if Molino's violation had been a failure to comply with the registration requirement, *Midwest* and *Logan* would have to be weighed against the Missouri Supreme Court's contrary decision in *Covert v. Cross*, 331 S.W.2d 576 (Mo. 1960). There, the purchasers of securities related to oil well leases sought rescission of the sale on the grounds that the securities had not been properly registered. The sellers wished to defend by showing that the purchasers had sought rescission only after learning that the oil wells were not productive, but the court refused to allow the estoppel defense, reasoning that it "would tend to nullify and defeat the very purpose of the statute, which is clearly penal in nature." *Id.* at 585; *see also Gowdy v. Richter*, 20 Ill. App. 3d 514, 525, 314 N.E.2d 549 (1974) (concluding that the Illinois Blue Sky Law "is clear in allowing only statutory, not equitable, defenses" and observing that the Law's "penal character" forecloses the "*in pari delicto* or estoppel defenses"). The rejection of the estoppel defense in *Covert* and *Gowdy* is especially persuasive, given that rescission was sought on the basis of the sellers' technical violations—their noncompliance with the registration requirement—and not, as here, on the seller's material misrepresentation concerning his ownership of the securities.[6]

---

[6] In *Pinter v. Dahl*, 486 U.S. 622, 108 S. Ct. 2063, 100 L. Ed. 2d 658 (1988), the United States Supreme Court considered the availability of the equitable defense of in pari delicto in a rescission suit based on the sale of unregistered securities. The Court permitted the defense "only where the plaintiff's role in the offering or sale of nonexempted, unregistered securities is more as a promoter than as an investor." *Id.* at 639. In the Court's view, "[b]ecause the Act is specifically designed to protect investors, even where a[n investor] actively participates in the distribution of unregistered securities, his suit should not be barred [by equitable

¶14 Likewise unavailing is Molino's reliance on a federal case that addresses the availability of equitable defenses in securities actions arising from a seller's misrepresentation. In *Royal Air Properties, Inc. v. Smith*, 312 F.2d 210 (9th Cir. 1962), the Ninth Circuit Court of Appeals permitted a seller, Smith, to assert common law defenses in an action brought under section 10(b) of the federal Securities Exchange Act of 1934, even though Smith had made misrepresentations in a prospectus sent to an investor. However, as Go2Net points out, *Royal Air* is distinguishable in a key respect. Unlike the Act, the federal act at issue in *Royal Air* did not "expressly provide a civil remedy." *Id.* at 212. Because the Ninth Circuit had previously held that, despite the absence of an express remedy in the federal act, a civil action could be brought to enforce section 10(b), the *Royal Air* court concluded that common law defenses could likewise be inferred from the silent statute: "Since civil liability was judicially implied, the appropriate common law defenses should be applicable. . . . Since courts generally interpret statutes in the context of the common law and Congress has not specifically denied the availability of these defenses, we see no reason why the ordinary defenses of estoppel and waiver should not be applicable." *Id.* at 213. While the *Royal Air* court was asked to apply the equitable defenses "to a remedy judicially inferred from an act of Congress," *id.*, in the present case, this court is being asked to make those defenses applicable to a remedy expressly provided in RCW 21.20.430, not a remedy judicially inferred from an act of the legislature. The Ninth Circuit's reasoning in *Royal Air* is inapposite here.

¶15 Even if the reasoning in *Royal Air* were apt, we would not be compelled to follow *Royal Air*. The Act is patterned after the Uniform Securities Act of 1956, which "has been wholly or substantially enacted in the great majority of states." *Go2Net*, 126 Wn. App. at 776 (citing *Cellular Eng'g*, 118 Wn.2d at 23-24). RCW 21.20.900 pro-

defenses] where his promotional efforts are incidental to his role as an investor." *Id.* at 638-39.

vides that the Act "shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation and administration of this chapter with the related federal regulation." As the Court of Appeals explained, "[t]his provision does not mean our courts must imitate the federal courts, however, only that in construing our state statute we must not interfere with the federal scheme." *Go2Net*, 126 Wn. App. at 776 (citing *Kittilson*, 93 Wn.2d at 227). Noting that Molino has not argued that the rejection of equitable defenses would interfere with the federal scheme, the Court of Appeals recalled this court's observation " 'that while the purpose of federal securities laws is to maintain the integrity of the secondary securities markets and to enforce disclosure, [the Act] is intended to protect investors.' " *Id.* at 776-77 (quoting *Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 125-26, 744 P.2d 1032, 750 P.2d 254 (1987)). *Royal Air* affords no persuasive support for Molino's argument that equitable defenses should be permitted under the Act.

## CONCLUSION

¶16 We agree with the Court of Appeals that the trial court properly dismissed Molino's equitable defenses of estoppel and waiver. While the Court of Appeals concluded "that equitable defenses are not available in an action under the Securities Act of Washington," 126 Wn. App. at 783, we hold that such defenses are unavailable in claims brought under RCW 21.20.010(2), saving for another day the question of whether equitable defenses may be permissible in actions alleging a violation of RCW 21.20.140, the Act's registration provision.

ALEXANDER, C.J., and C. JOHNSON, MADSEN, SANDERS, BRIDGE, CHAMBERS, FAIRHURST, and J.M. JOHNSON, JJ., concur.