# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| FEDERAL HOME LOAN BANK OF SEATTLE, a bank created by federal law,<br><br>Appellant,<br><br>v.<br><br>BARCLAYS CAPITAL, INC., a Connecticut corporation; BCAP LLC, a Delaware limited liability company; and BARCLAYS BANK PLC, a public limited company registered in England and Wales,<br><br>Respondents. | No. 75913-2-I<br><br>DIVISION ONE<br><br>PUBLISHED<br><br>FILED: December 11, 2017 |

Cox, J. — Under the Washington State Securities Act ("WSSA"), an investor who sues on the basis that a prospectus contains either untrue statements or omissions of material facts must prove reasonable reliance on these statements or omissions.[1] Here, the Federal Home Loan Bank of Seattle ("FHLBS") purchased two residential mortgage backed securities ("RMBSs") in

---

[1] RCW 21.20.010(2); Hines v. Data Line Sys., Inc., 114 Wn.2d 127, 134, 787 P.2d 8 (1990); Stewart v. Estate of Steiner, 122 Wn. App. 258, 264, 93 P.3d 919 (2004), review denied, 153 Wn.2d 1022 (2005); Go2Net, Inc. v. Freeyellow.com, Inc., 158 Wn.2d 247, 251, 143 P.3d 590 (2006).

2008 that were described in prospectus supplements. In 2009, FHLBS commenced this action under the WSSA against Barclays Capital, Inc., BCAP LLC, and Barclays Bank PLC (collectively, "Barclays"). The essence of its claim for rescission and other relief is that the prospectus supplements contain untrue statements or omissions of material facts about the securities FHLBS purchased.

The trial court granted Barclays's motion for summary judgment. In this appeal, FHLBS fails in its burden to show that there are genuine issues of material fact. Barclays is entitled to judgment as a matter of law. We affirm the summary dismissal of these claims.

Some background about the nature of the transactions at issue in this case may be helpful to provide context. In early 2008, FHLBS purchased the two RMBSs that are the subjects of this action. These securities were created by a process known as "securitization."[2]

The subjects of this securitization are 1,643 loans that IndyMac Bank made to various residential borrowers throughout the country. IndyMac decided whether to make each loan by a process called "underwriting." After each loan approval, each borrower began making monthly payments to IndyMac. For purposes of securitization, IndyMac was the "originator" of these loans.

After IndyMac originated these loans, it pooled them together and transferred them to a Barclays subsidiary. The subsidiary then deposited them in

---

[2] See Federal Housing Finance Agency v. Nomura Holding America, Inc., 60 F. Supp. 3d 479, 486 (S.D.N.Y. 2014).

a trust in exchange for investment certificates. The trust issued certificates that were then sold to FHLBS.

In sum, the stream of income from the monthly payments by borrowers for the loans from IndyMac, the originator, was transferred to FHLBS, the investor.

On February 13, 2008, FHLBS purchased the first security for $189,416,000. This RMBS is comprised of 951 of the 1,643 loans originated by IndyMac. This security is known as BCAP 2008-IND1 ("IND1").

On April 15, 2008, FHLBS purchased the second security for $232,438,000. This RMBS is comprised of the remaining 692 of the 1,643 loans originated by IndyMac. This is known as BCAP 2008-IND2 ("IND2").

During the underwriting process, most of these loans were characterized as "Alt-A", falling between "Prime" and "Subprime" loans in terms of creditworthiness. As their names suggest, Prime loans are those issued to borrowers who are the most credit worthy. Subprime loans, on the other hand, are to borrowers at the other end of the creditworthiness spectrum.

FHLBS purchased these securities at a time that one respected financial commentator has described as "the mortgage debacle — in 2008. That one brought world economies to the precipice and wiped out Lehman Brothers and a raft of troubled banks."[3]

---

[3] Gretchen Morgenson, After 20 Years of Financial Turmoil, a Columnist's Last Shot, N.Y. TIMES (Nov. 10, 2017), https://www.nytimes.com/2017/11/10/business/after-20-years-of-financial-turmoil-a-columnists-last-shot.html?emc=eta1 [https://perma.cc/SA9J-9FQK].

In 2009, FHLBS commenced this action against Barclays to rescind these transactions and for further relief. In 2011, the trial court first ruled that reasonable reliance on the statements in the prospectus supplements is an element of an investor's claim under the WSSA. In 2016, following extensive discovery by the parties, the trial court granted Barclays's motion for summary judgment on lack of reasonable reliance as to the IND1 and IND2 transactions. The court necessarily decided that FHLBS failed to show any genuine issue of material fact on this element and that Barclays was entitled to judgment as a matter of law.

FHLBS appeals.

## REASONABLE RELIANCE

Whether reasonable reliance is a necessary element of an investor's claim under the WSSA is a core issue in this case. FHLBS argues that the WSSA does not require that it prove that it reasonably relied on the statements in the prospectus supplements that it now challenges. We disagree and hold that such reliance is an essential element of an investor's claim under RCW 21.20.010(2).

We will affirm an order granting summary judgment where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[4] A material fact is one on which the outcome of the litigation

---

[4] McPherson v. Fishing Company of Alaska, 199 Wn. App. 154, 157, 397 P.3d 161, review denied, 189 Wn.2d 1021 (2017).

depends.[5] We review de novo orders of summary judgment.[6] We also review de novo a trial court's legal conclusions.[7]

In construing a statute, we seek to ascertain and carry out the legislature's intent.[8] When the legislature enacts a state statute substantially verbatim from a federal statute, "'it carries the same construction as the federal law and the same interpretation as federal case law.'"[9] When the legislature passes an "amendment to a statute without alteration of a section previously interpreted by the courts," such action may "evidence[] legislative acquiescence in the interpretation."[10]

Here, FHLBS focuses its arguments on two statements in the prospectus supplements for the two RMBSs that it purchased.

The first challenged statement states:

Mortgage loans that are acquired by IndyMac Bank are underwritten by IndyMac Bank according to IndyMac Bank's underwriting guidelines, which also accept mortgage loans meeting Fannie Mae or Freddie Mac guidelines regardless of whether such mortgage loans would otherwise meet IndyMac's guidelines, or

---

[5] Knight v. Dep't of Labor & Indus., 181 Wn. App. 788, 795, 321 P.3d 1275 (quoting Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008)), review denied, 181 Wn.2d 1023 (2014).

[6] Id.

[7] Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wn.2d 873, 880, 73 P.3d 369 (2003).

[8] Thorpe v. Inslee, 188 Wn.2d 282, 289, 393 P.3d 1231 (2017).

[9] Anfinson v. FedEx Ground Package System, Inc., 174 Wn.2d 851, 868, 281 P.3d 289 (2012) (quoting State v. Bobic, 140 Wn.2d 250, 264, 996 P.2d 610 (2000)).

[10] McKinney v. State, 134 Wn.2d 388, 403, 950 P.2d 461 (1998).

pursuant to an exception to those guidelines based on IndyMac's procedures for approving such exceptions.[11]

The essence of FHLBS's claim is that the statement is untrue or misleading because IndyMac allegedly did not follow "its own guidelines and procedures in making [these] loans."[12]

The other challenged statement deals with the loan to value ("LTV") ratios of these loans. FHLBS claims that many appraisals that determined the LTV ratios were not made in accordance with the Uniform Standards of Professional Appraisal Practice, the national standard of the appraisal profession. The numerator of this LTV ratio is the amount of a loan and the denominator is the appraised value of the property securing that loan. The purpose of this measure is to evaluate how much equity a borrower has in the property securing the loan.

RCW 21.20.010 states the elements of a claim under the WSSA:

It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:

. . . .

(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

. . . .

The question is whether the legislature intended reasonable reliance to be an element of a claim under this provision of the WSSA. We hold that it did.

---

[11] Clerk's Papers at 1554, 1564.

[12] Appellant's Opening Brief at 9.

6

We begin our analysis by noting the substantial similarity of this state provision with its federal counterpart. As the following chart shows, the provisions of these statutes are substantially the same.

| SEC Rule 10b-5 | RCW 21.20.010 |
|---|---|
| "It shall be unlawful for any person . . . in connection with the purchase or sale of any security . . . <br><br>(a) To employ any device, scheme, or artifice to defraud, <br><br>(b) ***To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading,*** or <br><br>(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . . ."[13] | "It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly: <br><br>(1) To employ any device, scheme, or artifice to defraud; <br><br>(2) ***To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading;*** or <br><br>(3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."[14] |

The state supreme court has determined that RCW 21.20.010 "is patterned after and restates in substantial part the language of the federal

---

[13] (Emphasis added.)

[14] (Emphasis added.)

7

Securities Exchange Act of 1934."[15] And this court has clarified that RCW 21.20.010 is "related" to Section 10(b) of that act, as well as SEC Rule 10b-5.[16]

The words "reasonable reliance" do not appear in Rule 10b-5 or in RCW 21.20.010(2), its state counterpart. But the United States Supreme Court has long required reliance in Rule 10b-5 actions.[17] And Washington law holds that once a court makes a controlling interpretation of a statute, that interpretation controls what the statute has always meant.[18] Thus, Rule 10b-5 has always required a showing of reasonable reliance, and did so when this state's legislature drew upon it to craft RCW 21.20.010(2).

Accordingly, we conclude that the state legislature enacted RCW 21.20.010(2) with the intent that it be construed in the same way as Rule 10b-5 and have the same interpretation as federal case law of that rule.[19] In short, reasonable reliance is a necessary element of this state claim.

It is particularly noteworthy that since Washington courts began recognizing a reliance requirement in 1970,[20] the legislature has amended the

---

[15] Clausing v. DeHart, 83 Wn.2d 70, 72, 515 P.2d 982 (1973).

[16] Guarino v. Interactive Objects, Inc., 122 Wn. App. 95, 110, 86 P.3d 1175 (2004).

[17] See, e.g., Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. 135, 140 n.3, 131 S. Ct. 2296, 180 L. Ed. 2d 166 (2011); Basic Inc. v. Levinson, 485 U.S. 224, 242, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 206, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976)).

[18] In re Pers. Restraint of Johnson, 131 Wn.2d 558, 568, 933 P.2d 1019 (1997).

[19] Anfinson, 174 Wn.2d at 868 (quoting Bobic, 140 Wn.2d at 264).

[20] Shermer v. Baker, 2 Wn. App. 845, 858, 472 P.2d 589 (1970).

WSSA eight times.[21] Not once did it modify the requirement that reliance is a required element. This is telling.

As the Ninth Circuit Court of Appeals has explained, "'the Washington Legislature may be presumed to have known'" about the requirements of Rule 10b-5.[22] With this presumed knowledge and no amendment of the WSSA to omit the reasonable reliance element, we must presume that the legislature intended that element to remain a part of this state statute.

FHLBS fails to argue why these principles do not control the determination of the legislature's intent in enacting this statute. Instead, it rests its arguments on reading case law and statutes in unpersuasive ways.

We note that our interpretation of the legislative intent of the statute has been consistently stated by the state supreme court and other appellate courts of this state. The supreme court held in Hines v. Data Line Systems, Inc. that plaintiffs proceeding under RCW 21.20.010 must show that they "relied on the misrepresentations in connection with the sale of the securities."[23] Only "an investor who is wrongfully induced to purchase a security may recover his investment."[24]

---

[21] Laws of 1998, ch. 15, § 20; Laws of 1986, ch. 304, § 1; Laws of 1985, ch. 171, § 1; Laws of 1981, ch. 272, § 9; Laws of 1979, Ex. Sess., ch. 68, § 30; Laws of 1977, Ex. Sess., ch. 172, § 4; Laws of 1975, 1st Ex. Sess., ch. 84, § 24; and Laws of 1974, Ex. Sess., ch. 77, § 11.

[22] Wade v. Skipper's, Inc., 915 F.2d 1324, 1331 (9th Cir. 1990) (quoting WPPSS Securities Litigation, 1986 Blue Sky Law Rptr. ¶ 71,675 (W.D. Wash., MDL 1986)).

[23] 114 Wn.2d 127, 134, 787 P.2d 8 (1990).

[24] Id. at 135.

Subsequent opinions have consistently followed this holding.[25] And in no case has any Washington court departed from this interpretation of the statute.

Notably, in Stewart v. Estate of Steiner, this court reiterated the requirement of reasonable reliance when holding that the investor in that case did not have a cause of action under the WSSA.[26] As this court stated in that opinion, "The question is whether [the investor] *reasonably relied* on any of [the written materials] in making his investment decision."[27] If he did not, he failed to establish "an essential element of his claim."[28]

Notably, the supreme court denied review in that case. Had the court believed that this court had misstated the law by holding that reasonable reliance is an essential element of a claim under the WSSA, it seems likely that the court would have granted review to address the issue. It did not.

FHLBS advances a number of arguments why this statute does not require reasonable reliance. They are not persuasive.

FHLBS argues that the decision of the trial court violates the jurisprudence of this state that the WSSA is to be interpreted to protect investors. We disagree.

---

[25] See, e.g., Go2Net, Inc., 158 Wn.2d at 251; Guarino, 122 Wn. App. at 110; Helenius v. Chelius, 131 Wn. App. 421, 441, 120 P.3d 954 (2005); Stewart, 122 Wn. App. at 264.

[26] 122 Wn. App. 258, 264, 93 P.3d 919 (2004), review denied, 153 Wn.2d 1022 (2005).

[27] Id. at 265 (emphasis added).

[28] Id. at 266.

First, FHLBS is correct that a purpose of this act is to protect investors.[29] With this purpose in mind, we construe the WSSA liberally.[30] But this general statement of purpose does not eliminate the clear legislative intent that we have already discussed in this opinion that reasonable reliance is a necessary element for a claim under RCW 21.20.010(2).

Second, FHLBS also argues that the legislature intended to eliminate, not impose, a requirement to prove reasonable reliance. Not so.

A basis for this argument is that the supreme court has held that certain elements of common law fraud, on which a WSSA action is based, are unnecessary to prove. For example, the supreme court held that a plaintiff need not show scienter in Kittilson v. Ford.[31] An earlier court of appeals decision had held otherwise, following the United States Supreme Court's holding in Ernst & Ernst v. Hochfelder.[32]

The Ernst & Ernst court had explained that because Rule 10b-5 derived from Section 10(b) of the 1934 Securities Exchange Act, and because Section 10(b) speaks of manipulation and deception, a Rule 10b-5 suit "clearly connotes intentional misconduct."[33] Section 10(b) imposed this requirement even though

---

[29] FutureSelect Portfolio Management, Inc. v. Tremont Group Holdings, Inc., 180 Wn.2d 954, 970, 331 P.3d 29 (2014).

[30] Id.

[31] 93 Wn.2d 223, 225-27, 608 P.2d 264 (1980).

[32] Ludwig v. Mutual Real Estate Investors, 18 Wn. App. 33, 41, 567 P.2d 658 (1977) (citing Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976)).

[33] 425 U.S. at 201.

the language of Rule 10b-5, standing alone, reached "any type of material misstatement or omission, and any course of conduct, that has the effect of defrauding investors, whether the wrongdoing was intentional or not."[34] But Section 10(b) conveyed to it the scienter requirement.[35]

But our state supreme court held that RCW 21.20.010 neither incorporated nor derived from a statute incorporating Section 10(b)'s scienter language.[36] And the legislative history of RCW 21.20.010 did not suggest a scienter requirement.[37]

Furthermore, the supreme court in Hines concluded that a WSSA plaintiff need not show loss causation but it did not suggest that liability is strict under the statute.[38] It based this decision on the nature of the remedy the WSSA provided. The "basic remedy" of that statutory scheme was rescission.[39] Under this scheme, an investor received the same remedy regardless of the size or occurrence of loss.[40] Thus, loss was irrelevant and unnecessary to prove in a WSSA suit.[41]

---

[34] Id. at 212.

[35] Id. at 215.

[36] Kittilson, 93 Wn.2d at 226.

[37] Id.

[38] 114 Wn.2d at 135.

[39] Id.

[40] Id.

[41] Id.

These cases do not support the generalized proposition that RCW 21.20.010 is a strict liability statute. They merely illustrate that scienter and loss causation are not part of the statute. More importantly, they do nothing to support the argument that reliance is not an essential element of a WSSA claim, as Hines and other appellate decisions in this state have consistently held.

Third, FHLB argues that the legislature intended WSSA actions to be strict liability actions because it borrowed language from Section 12(2) of the 1933 federal Securities Act. We again disagree.

It is undisputed that Section 12(2) of the 1933 act created a strict liability cause of action.[42] Moreover, the state legislature borrowed language from that section in crafting the scheme of the WSSA.[43] But the legislature only borrowed Section 12(2)'s remedy to draft the WSSA's remedy provisions in RCW 21.20.430. In contrast, it borrowed the state act's liability provisions from Rule 10b-5.

We note that RCW 21.20.430 clearly states by cross reference that RCW 21.20.010 defines liability.[44] Thus, RCW 21.20.430 and Section 12(2) are irrelevant to whether RCW 21.20.010 requires a plaintiff to show reliance to establish liability.

---

[42] Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 576, 115 S. Ct. 1061, 131 L. Ed. 2d 1 (1995).

[43] See RCW 21.20.430; 15 U.S.C. § 77l.

[44] RCW 21.20.430(1).

13

Fourth, FHLBS contends that the statutes of other states persuasively suggest that RCW 21.20.010 is a strict liability statute. But the statutes of other states are largely irrelevant to determining the legislative intent of Washington's legislature.

Washington courts strive to "construe [the WSSA] as to effectuate its general purpose to make uniform the law of those states which enact" and adapt the Uniform Securities Act.[45] That uniform act also provided the basis for the WSSA. But this "does not mean our courts must imitate" the example of other states when Washington law differs.[46] Simply stated, the legislatures of other states do not decide what the Washington legislature intended by the WSSA. It is Washington law, in the end, that governs.[47]

Finally, FHLBS argues that the language in Hines, stating that reliance is an element under the WSSA, was mere dicta, which this court should not have followed in two previous decisions and should not follow now. We disagree with reading Hines and the cases that follow in this way. To the contrary, they clearly establish that reasonable reliance is an essential element of this claim.

Even if we were persuaded that the statement in Hines regarding reliance was dicta, that would not change our conclusion that the legislature intended reasonable reliance to be an essential element of a claim under RCW

---

[45] RCW 21.20.900.

[46] Go2Net, Inc., 158 Wn.2d at 258 (quoting Kittilson, 93 Wn.2d at 227).

[47] In re Petersen, 138 Wn.2d 70, 80-81, 980 P.2d 1204 (1999).

21.20.010(2). That is the core question, not whether the statement in <u>Hines</u> is dicta.

For the reasons we have explained, we are convinced that the legislature intended that an investor must prove reasonable reliance in a claim under the WSSA.

## GENUINE ISSUES OF MATERIAL FACT

Having concluded that reasonable reliance is an essential element that FHLBS must prove in this case, the question that follows is whether it met its burden to show the existence of any genuine issue of material fact on that element in response to Barclays's motion for summary judgment. We conclude that it failed in this burden.

It is not enough that a plaintiff relied upon the defendant's statements in purchasing securities. The WSSA requires that such "reliance must be reasonable under the surrounding circumstances."[48]

Reasonable reliance is generally a factual question.[49] However, if reasonable minds could reach only one conclusion, summary judgment on this element is proper.[50]

Our inquiry focuses on determining the existence of genuine issues of material fact whether FHLBS reasonably relied on the two statements it

---

[48] <u>FutureSelect Portfolio Management, Inc. v. Tremont Group Holdings, Inc.</u>, 175 Wn. App. 840, 868, 309 P.3d 555 (2013).

[49] <u>Morgan v. Irving</u>, 8 Wn. App. 354, 356, 506 P.2d 316 (1973).

[50] <u>M.A. Mortenson Co., Inc. v. Timberline Software Corp.</u>, 140 Wn.2d 568, 579, 998 P.2d 305 (2000).

challenges. After carefully reviewing the extensive record before us, we conclude that FHLBS failed to show any genuine issue of material fact supporting the argument that it reasonably relied on these statements.

FHLBS is, without question, a sophisticated investor in RMBSs. Yet minutes of its risk management committee dated February 2008 warn that all but three of the regional FHLB banks, the Seattle branch within this minority, had stopped purchasing securitized "Alt-A" loans.[51] The minutes also report that another regional bank---Boston---was advised not to buy any additional mortgage backed securities for its portfolio. Credit Analysis Manager Len Reininger alerted his colleagues at the meeting to "how rapidly housing prices have plummeted and foreclosures and delinquencies have increased."[52] But at that time, Joel Adamo, Portfolio Manager on both the IND1 and IND2 transactions, was already considering purchase of IND2.

The risk management committee decided on February 29, 2008 that "with the uncertainty in the markets and the issues discussed that it would be desirable to look at alternative investment opportunities to those the Bank had been utilizing recently."[53]

The committee thus directed Reininger and Adamo to develop together "a proposal for the [RMBS] investment criteria that would be used in the current

---

[51] Clerk's Papers at 662.

[52] Id. at 663.

[53] Id. at 662-63.

market conditions."[54]  Until then, the committee directed a ban on the purchase of such securities.

Reininger preferred to maintain a total ban, until "the market settle[d] down."[55]  But senior FHLBS staff differed and sought a compromise that would let them "still make some money."[56]  Adamo and Reininger reached such a compromise to recommend lifting the ban for certain RMBS purchases.

In spite of these internal warnings, FHLBS continued purchasing IndyMac originated securities, comprised of Alt-A loans.

The record also shows that FHLBS initially made an internal decision not to purchase further securities of this type, only to change that decision to use available funds to purchase IND1 and IND2.

A November 2007 internal FHLBS memorandum also provides notice about IndyMac, the originator of the loans that were securitized and purchased by FHLBS.  The memo states in relevant part:

> "IndyMac, the second-largest independent U.S. mortgage lender, lost $202.7 million in the third quarter, five times bigger than the company predicted.  The company stated, 'We are in the midst of the most severe downturn our industry has experienced in modern times.'"[57]

---

[54] Id. at 663.

[55] Id. at 690.

[56] Id.

[57] Id. at 1706.

17

Three months later and despite this and other information, FHLBS proceeded with the purchase of securities that were originated by IndyMac, the author of this warning.

Notably, the record shows that FHLBS was deeply involved in selecting the loans originated by IndyMac that ultimately constituted the two securities the bank purchased. This record also shows the selections occurred during communications directly between FHLBS and IndyMac, without involvement of Barclays.

This and other evidence in the record before us supports our conclusion that FHLBS did not reasonably rely on the statements it now claims induced it to buy IND1 and IND2. Reasonable minds could only reach this conclusion.

An alternative analysis further supports our conclusion that there are no genuine issues of material fact on reasonable reliance. In <u>Stewart v. Estate of Steiner</u>, this court utilized eight factors for considering whether reliance was reasonable under the circumstances of that case.[58] <u>Stewart</u> borrowed this test from an opinion of the First Circuit Court of Appeals, <u>Jackvony v. RIHT Financial Corp.</u>, authored by then Judge Stephen Breyer.[59]

---

[58] 122 Wn. App. 258, 274, 93 P.3d 919 (2004).

[59] 873 F.2d 411 (1st Cir. 1989).

The First Circuit's test has been widely applied by the federal courts, including the Second, Fourth, Sixth, Eighth, Tenth, and Eleventh circuits, in considering Rule 10b-5 claims.[60]

We again apply these factors, as we did in Stewart, to determine whether there are any genuine issues of material fact, recognizing that no such issue exists where reasonable minds could reach only one conclusion.[61] FHLBS provides only cursory mention of these factors in a footnote in its brief. We consider this footnote, as well as the record generally, in applying these factors.

No individual factor of this test is necessarily dispositive.[62] The factors are:

> (1) [T]he sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.[63]

---

[60] Brown v. E.F. Hutton Grp., Inc., 991 F.2d 1020, 1032 (2d Cir. 1993); Davidson v. Wilson, 973 F.2d 1391, 1400 (8th Cir. 1992); Myers v. Finkle, 950 F.2d 165, 167 (4th Cir. 1991); Molecular Technology Corp. v. Valentine, 925 F.2d 910, 918 (6th Cir. 1991); Bruschi v. Brown, 876 F.2d 1526, 1529 (11th Cir. 1989); Zobrist v. Coal-X, Inc., 708 F.2d 1511, 1516 (10th Cir. 1983).

[61] M.A. Mortenson Co., Inc., 140 Wn.2d at 578.

[62] Stewart, 122 Wn. App. at 274.

[63] Id.

*Plaintiff's Sophistication*

As for the first factor, "a sophisticated investor requires less information to call a '[mis-]representation into question' than would an unsophisticated investor."[64]

Here, FHLBS is indisputably sophisticated in the purchase of RMBSs. Along with other Federal Home Loan Banks, it was established by federal charter to facilitate mortgage lending.[65] By its own admission, it serves more than 300 members, "mainly community banks and credit unions" throughout the Western United States and the Pacific Territories.[66] It invests, including in RMBSs, to provide mortgage loan financing to borrowers. In doing so, it amassed an $8 billion portfolio of RMBSs.

Importantly, Joel Adamo, the portfolio manager for these two transactions, when testifying at deposition, was asked whether he was a sophisticated mortgage backed securities purchaser. He answered that he was "really knowledgeable about all the different securities types that are out there in the market."[67] He identified himself as an "expert on mortgage-backed securities."[68]

Reasonable minds could not differ that FHLBS is a sophisticated purchaser of these two RMBSs. FHLBS does not argue otherwise.

---

[64] Banca Cremi, S.A. v. Alex. Brown & Sons, Inc., 132 F.3d 1017, 1028 (4th Cir. 1997).

[65] 12 C.F.R. § 1265.2.

[66] Clerk's Papers at 159.

[67] Id. at 1654.

[68] Id. at 1657.

*Longstanding Relationships*

FHLBS and Barclays lacked a longstanding business or personal relationship prior to these two transactions. Thus, reasonable minds could not differ whether Barclays was in a position to more easily defraud FHLBS.

Nothing in FHLBS's briefing suggests otherwise.

*Access to Relevant Information*

FHLBS argues that it lacked access to information necessary to avoid relying on Barclays's alleged statements in the prospectus supplements. This is an unproven assertion that fails to create a genuine issue of material fact.

A plaintiff relies unreasonably when he "'possesses information sufficient to call [a mis-]representation into question,' but nevertheless 'close[s] his eyes to a known risk.'"[69] A plaintiff conscious of such risk relies unreasonably when he refuses to make necessary further investigations.[70]

We have already explained why FHLBS was warned both about IndyMac and the Alt-A loans that comprised the securities it purchased. Yet, despite these prior warnings, it proceeded with these transactions. FHLBS fails to point to any evidence in the record to show that it asked for any additional information it believed material to either of the two statements it now challenges.

A fair reading of the relevant portions of the supplements further undercuts this claim of lack of access to information.

---

[69] Banca Cremi, S.A., 132 F.3d at 1028 (quoting Teamsters Local 282 Pension Trust Fund v. Angelos, 762 F.2d 522, 530 (7th Cir. 1985)).

[70] Id.

First, Barclays provided information regarding the relevant risks in the prospectus supplements themselves. Regarding internal IndyMac guidelines adherence, the IND1 prospectus supplement explained that the loans were originated "generally" in accordance with described underwriting guidelines. It explained that IndyMac used both traditional and electronic underwriting. But it also explained that IndyMac had processes to override its guidelines and make exceptions. It stated that IndyMac determined a borrower's FICO credit score by selecting the middle score of those provided by each of the major credit repositories and then choosing the lowest of these, making exceptions when a borrower had higher income or assets. And it explained that IndyMac could consider "compensating factors that would allow mortgage loans not otherwise meeting IndyMac Bank's guidelines."[71]

Barclays provided similar statements in the prospectus supplement for IND2, explaining that IndyMac approves loans under six different documentation programs. These vary, ranging from full verification of employment, income, and asset verification, to programs requiring no documentation or verification for borrowers with better credit scores and more valuable collateral property.

It also explained that loans failing to meet IndyMac guidelines could be "manually re-underwritten and approved under an exception to those underwriting guidelines."[72] It explained the compensating factors that would support an exception might include "significant financial reserves, a low loan-to-

---

[71] Clerk's Papers at 1554.

[72] Id. at 1555, 1566.

value ratio, significant decrease in the borrower's monthly payment[,] and long-term employment with the same employer."[73] Thus, the prospectus supplements alerted FHLBS to possible divergences from the mortgage approval and guidelines.

In sum, this unproven claim that FHLBS lacked access to information it needed is without any support in the record.

Adamo himself expressed similar sentiments. He testified at his deposition that he "monitor[ed] market developments impacting the mortgage-related assets [he] bought."[74] He further testified that there was "turmoil in the RMBS market" at the time he made the relevant purchases.[75] During that discussion, he stated that "RMBS bonds backed by collateral pools of 2006 vintage collateral would never fully recover in price."[76] Further, he knew that any problems regarding subprime loans in the market could "leak into the rest of the market."[77] Bluntly, he testified that the "market was just plummeting" in late 2007.[78]

But, after purchasing IND1, FHLBS still had several hundred million dollars to invest. As discussed above, risk managers at FHLBS repeatedly

---

[73] Id. at 1556, 1567.

[74] Id. at 1655.

[75] Id. at 534.

[76] Id. at 537.

[77] Id. at 580.

[78] Id. at 527.

warned about the riskiness of investing in RMBS based on loans originated with IndyMac. These warnings appear in the minutes of the risk management committee and in internal FHLBS memos from the relevant times. The record thus clearly indicates that FHLBS knew that these transactions carried great risk.

FHLBS possessed access to similar information regarding LTV ratios. This information was less extensive but that which was available was explicitly concerning. This information was provided in the prospectus supplements. These explained that IndyMac appraised the relevant mortgaged property in accordance with the Uniform Standards of Profession Appraisal Practice, and would either do a traditional inspection appraisal or else employ the algorithmic automated valuation model. But it also noted that "the determination of the value of a mortgaged property used in the calculation of the loan-to-value ratios of the mortgage loans may differ from the appraised value of such mortgaged properties or the actual value of such mortgaged properties."[79]

FHLBS was further aware that "appraisals are an art and not an exact science."[80] Vice President Gregory Teare explained that "[t]ypically, most appraisers will state the an [sic] appraisal of +/- 10% of the actual value."[81] This is relevant to the second challenged statement in the prospectus supplements.

---

[79] Id. at 1548, 1562.

[80] Id. at 1422.

[81] Id.

24

### Fiduciary Relationship

FHLBS and Barclays lacked a fiduciary relationship that might have enabled Barclays to defraud FHLBS. Reasonable minds could not differ on this factor.

FHLBS does not argue otherwise in its briefing on appeal.

### Concealment

FHLBS fails to point to anything in this record to indicate any concealed fraud. As explained previously in this opinion, the prospectus supplements warned FHLBS about the integrity of the underlying collateral. They alerted FHLBS to possible variances from guideline adherence and LTV accuracy. And FHLBS cannot show that Barclays barred it from accessing the loan files. Thus, reasonable minds could not differ on this factor.

### Opportunity to Detect the Fraud

As discussed above, FHLBS fails to demonstrate it lacked an opportunity to detect that alleged fraud. Adamo claimed that he could not obtain the loan files, but he never claimed to have asked for them. Similarly, the record indicates that neither Adamo nor anyone else at FHLBS asked for the underwriting or appraisal guidelines or information on possible divergences therefrom.

Rather, Adamo stated that:

> [he] rel[ied] on the securitization people who are making this – on their due diligence and their writings in the security. There is [sic] weaknesses and strengths with every factor, and I would try to take those into account. But I had limited knowledge as to what exactly happened between a loan officer and the security.[82]

---

[82] Id. at 4300.

Adamo recognized there could be fraud in the pool but explained that he was not buying the pool but rather its securitization. He "relied on the representations given to [him] by the securitizer" despite "[r]ecognizing that there are risks in an investment."[83]

But Adamo's reliance on Barclays does not imply he lacked the opportunity to detect any possible fraud. Thus, reasonable minds could not differ whether FHLBS had an opportunity to detect the alleged fraud.

### Initiation or Expedition of Transaction

The parties hotly dispute this seventh factor. Each alleges that the other drove the purchases of IND1 and IND2. Because this nondispositive factor does not appear to us to create a genuine issue of material fact, we need not decide who, Barclay or FHLBS, initiated this transaction.

After careful review of the record, we conclude that nothing in the discussion about this factor is material in determining the dispositive question: whether FHLBS reasonably relied on the quoted statements in the prospectus supplements regarding variances in IndyMac guideline adherence and the accuracy of LTV ratios. At no point does either party reference IndyMac's alleged divergence from loan underwriting guidelines. Nor does either party call into question the accuracy of LTVs. For these reasons, we conclude that any factual dispute on this factor is not material for summary judgment purposes.

---

[83] Id. at 4304.

*Specificity of Statements*

Regarding this factor, FHLBS only challenges two statements in the prospectus supplements. The question here is how general or specific these statements were, not whether they were untrue or misleading.

The first challenged statement reads:

> Mortgage loans that are acquired by IndyMac Bank are underwritten by IndyMac Bank according to IndyMac Bank's underwriting guidelines, which also accept mortgage loans meeting Fannie Mae or Freddie Mac guidelines regardless of whether such mortgage loans would otherwise meet IndyMac Bank's guidelines, or pursuant to an exception to those guidelines based on IndyMac Bank's procedures for approving such exceptions.[84]

The second statement noted that the appraisals underlying the LTVs were made in accordance with the Uniform Standards of Professional Appraisal Practice.

These statements, especially when accompanied by certain qualifying language, were highly general. The first statement did not purport to explain what the underwriting guidelines were, or the procedures for overriding them. But both prospectus supplements explained that IndyMac could make exceptions from its guidelines if a loan application included compensating factors. Such factors might include "significant financial reserves, a low loan-to-value ratio, significant decrease in the borrower's monthly payment[,] and long-term employment with the same employer."[85]

---

[84] Id. at 1554, 1564.

[85] Id. at 1556, 1567.

The statement regarding appraisal practice standards was similarly general and qualified. The statement itself made no claim as to the accuracy of the appraisals, only naming the standards employed. But the prospectus supplements also stated that "the determination of the value of a mortgaged property used in the calculation of the loan-to-value ratios of the mortgage loans may differ from the appraised value of such mortgaged properties or the actual value of such mortgaged properties."[86]

Read alone or in the context of the respective prospectus supplements, these statements were highly generalized and subject to qualifications. They did not provide FHLBS any specific assurance or detail regarding the nature or quality of the collateral. They noted only the general procedure for acquiring loans and appraising properties, both subject to wide variances.

Reasonable minds could not differ that these statements were highly general and provided no specific assurances.

Applying the Stewart factors, we conclude that FHLBS fails to meet its burden in showing a genuine issue of material fact whether it reasonably relied on the challenged statements.

FHLBS also argues for the existence of other minor genuine issues of material fact. We disagree with its unconvincing arguments.

FHLBS argues that statements in the supplements that the readers should only rely on information in those documents creates an issue of fact. FHLBS similarly argues that Barclays assured investors that it was meticulous in

---

[86] Id. at 1548, 1562.

28

preparing the supplements. But these arguments are directly contrary to settled law that reasonable reliance is determined by considering all the circumstances, not just what is in a prospectus supplement.

FHLBS also argues that Barclays's statements were specifically about the 1,643 loans constituting these two securities, and not the general climate of RMBS investments. That is true. But it does not create a genuine issue of material fact, given there were both internal and external warnings that put FHLBS on notice that it could not solely or reasonably rely merely on the supplements.

And FHLBS also argues that it had no access to loan files and that it was therefore unable to detect whether the prospectus supplements contained untrue or misleading statements. But, given the information that was available, FHLBS was on notice that the loans constituting the securities were risky and that the originator of those loans was also troubled. It could have asked for more information, but there is no evidence that it did.

We affirm the summary dismissal of these claims.

Cox, J.

WE CONCUR:

Spearman, J.

Schindler, J.

29